UNITED STATES of America, Appellee,

v.

Larry KNOHL, Appellant.

No. 340, Docket 30879.

United States Court of Appeals Second Circuit.

Argued Feb. 21, 1967.

Decided June 22, 1967.

**430**

Murray I. Gurfein, New York City (Goldstein, Judd & Gurfein and Jacob W. Heller, New York City, on the brief), for appellant.

David M. Dorsen, Asst. U. S. Atty., Southern District of New York (Robert M. Morgenthau, U. S. Atty., and Michael F. Armstrong and Frederick F. Greenman, Jr., Asst. U. S. Attys., Southern District of New York, on the brief), for appellee.

Before FRIENDLY, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge:

On April 27, 1966 the appellant, Larry Knohl, was indicted on a charge that on or about August 25, 1965 he "unlawfully, wilfully, knowingly and corruptly endeavored to influence Kay B. Fuller, a witness under subpoena to appear before a Grand Jury. * * *" in violation of 18 U.S.C. § 1503.[1] The trial commenced on July 6, 1966. On July 18, 1966 the jury found him guilty, and on September 14, 1966 the court sentenced him to five years imprisonment.

There was evidence from which the jury could have found the following facts. Appellant and Mrs. Fuller had been business acquaintances for about twenty years. During most of that period she was employed as a confidential secretary by one Josiah Kirby of Cleveland, Ohio, who died in 1959 and who in his lifetime had had some business dealings with the appellant. In early August of 1965, the appellant told Mrs. Fuller that he had some $100,000 United States Treasury six month bearer bills and requested her to borrow some money against them or otherwise convert them to cash for him. He offered her $40,000 for doing so. He explained that, although the bills had been given to him in payment of a loan, he could neither keep them nor cash them himself, because there was a federal tax lien outstanding against him. Mrs. Fuller agreed to accede to his request, and he suggested that she explain her possession of the bills to the bank, through which the transaction would take place, by saying that they had been given to her by Kirby. Mrs. Fuller, however, was not anxious to name Kirby as her benefactor, because Kirby had been dead about two years and only six months bills were involved. Appellant then suggested that Mrs. Fuller use the name of somebody else who had recently died. She suggested one Cyril O'Neil of Cleveland, formerly a client of Kirby's, and it

---

1. 18 U.S.C. § 1503 provides:
 "Whoever corruptly * * * endeavors to influence, intimidate, or impede any witness * * * before * * * any grand or petit juror * * * in or of any court of the United States * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both."

was agreed between them that she would use O'Neil's name.

On August 6th, accompanied by the appellant, Mrs. Fuller went to a branch of the Chemical Bank in New York City, where she succeeded in borrowing $95,-000 by putting up one of the bills as security. The Bank credited part of the money to a checking account which Mrs. Fuller maintained there, and paid her the balance with a $25,000 cashier's check and $30,000 in cash. Mrs. Fuller immediately gave both the cashier's check and the cash to the appellant and eventually transferred the remaining $55,000 to him by drawing checks on her account.

On August 9th, the transaction was substantially repeated at the same bank with another $100,000 Treasury bill, and Mrs. Fuller again gradually transferred the proceeds to the appellant.

On August 12 and 13, Mrs. Fuller converted four more $100,000 Treasury bills into cash for the appellant at Barclay's Bank in New York City, which sold the bills and credited the proceeds to an account which she maintained there. She subsequently drew checks on this account, through which she transferred almost all of the amount received to the appellant.

On August 18, when she returned to the Chemical Bank to get a $10,000 cashier's check, payable to Knohl and chargeable to the balance still remaining in her account, Mrs. Fuller was questioned by Secret Service agents about the source of her Treasury bills. When Mrs. Fuller returned to Barclay's Bank on August 24th to draw out another $10,000 for the appellant, she was met by F.B.I. Agent Goss, who told her that the Treasury bills had been stolen from the Bankers Trust Company in New York City, and he questioned her at some length. Later that day she returned to her apartment. Knohl joined her there and she told him what Agent Goss had said about the illicit source of the bills. Knohl denied that they had been stolen and said to Mrs. Fuller, "Stick to your story, the O'Neil story * * *, because a dead man can tell no tales." Both following this instance and the prior occasion when she

had been questioned by the Secret Service Agent on August 18th, Mrs. Fuller contacted her attorney, Abraham Brodsky, for advice.

On August 25th, Mrs. Fuller was served with a subpoena to appear before a Grand Jury of the United States District Court for the Southern District of New York on the morning of August 26th. She immediately got word to the appellant, who later came to her apartment. Concerning the subpoena he said, "Don't worry about it. You stick to the O'Neil story and nothing will happen." Mrs. Fuller again telephoned and later visited Attorney Brodsky, who eventually joined her and the appellant at her apartment to discuss the matter of her testifying before the Grand Jury. In the presence of Attorney Brodsky, appellant again urged Mrs. Fuller to stick to the story that she had received the Treasury bills from Cyril O'Neil, but the attorney advised her to "tell the truth."

Mrs. Fuller did not testify before the Grand Jury until August 27, 1965; on August 26 she voluntarily submitted to a full interrogation about the case by an assistant United States attorney. After she returned home on August 26, the appellant again came to her apartment and urged Mrs. Fuller in testifying before the Grand Jury to adhere to the story that O'Neil was the source of the Treasury bills and otherwise to invoke her Fifth Amendment privilege against self-incrimination. Mrs. Fuller, however, answered all questions directed to her before the Grand Jury. The appellant was not indicted by that Grand Jury but by another one on April 27, 1966.

The appellant presents several grounds for appeal. He asserts that in violation of his federal constitutional rights he was denied a hearing on his claim that he was physically and mentally incompetent to stand trial, that certain evidence was improperly admitted, that the Government failed to fulfill its duty, in the course of discovery before trial, to disclose and turn over to him certain tape recordings containing statements by him and that the Government failed to

offer proof by at least two witnesses that the statement which was the basis of the obstruction of justice charge was false. We hold that these claims are not substantiated and therefore affirm.

About November 15, 1965, the appellant had suffered a cerebral stroke, which partially disabled him, and it is on this circumstance and its consequences that he bases his claim on appeal that he was physically and mentally incapacitated to stand trial on July 6, 1966. The appellant was first examined by a court-appointed physician on March 5, 1966, in connection with the trial of a pending charge, unrelated to the present case, in the United States District Court for the Eastern District of New York. The physician was Dr. Samuel Brock, an internist, who reported to the court on March 15, 1966 that Knohl was unable to withstand the rigors of a trial estimated to last several months which he would be required to attend frequently, but the doctor suggested a re-examination in six months. According to Dr. Brock's report, appellant's primary symptoms were paralysis of the right side of his body, which caused him difficulty in eating and speaking, and emotional excitability. The appellant was able to take a few steps with the aid of a cane but otherwise was confined to the use of a wheelchair. Dr. Brock also reported that the appellant suffered from long standing hypertension and diabetes but that the appellant was "well-oriented, alert and responsive, and his behavior for the most part is normal (except for the occasional over emotional episode)" and "gave no evidence of reduction in his ordinary intellectual capacities."

On May 9, 1966, with consent of appellant's trial counsel and counsel for the Government, appellant was ordered by Judge Frankel of the Southern District of New York to undergo a re-examination by Dr. Brock to determine whether he was able to stand trial under the present indictment. The examination took place the same day. Dr. Brock found no new symptoms present, except that appellant claimed more pain in his right hand and shoulder; his diagnosis remained the same. He concluded, however, that there were signs of exaggeration by the appellant, because the claimed diminution of sensation did not fit the normal pattern of the disease, and that these exaggerations bore on the question of appellant's ability to stand trial. Dr. Brock was of the opinion that the appellant would be able to go through a trial lasting approximately two weeks, but suggested that a nurse or doctor be present.

After this report had been presented to Judge Frankel on May 11, 1966, the Government pressed for assignment of the case for trial in June, claiming that it would take only two weeks to try and that an early assignment was urgent because Knohl was threatening to kill Mrs. Fuller. Counsel for Knohl, however, sought a postponement of the trial until September and made reference to letters from Dr. Dolger, a specialist in diabetes, and Dr. Frieden, a therapist, who said that the trial would be hazardous to the appellant's health. On June 1, 1966 Judge Frankel referred the case to Judge Croake for trial and also left for Judge Croake's determination defense counsel's request for adjournment based upon his claim that he had not finished his preparation for trial and that the defendant Knohl was physically unable to stand trial. On June 13, 1966 at a conference with Judge Croake, counsel for the Government and counsel for the defendant agreed upon a joint examination of Knohl by Drs. Brock, Dolger and Frieden. Drs. Dolger and Frieden were of the opinion that the stress and strain of a trial would be hazardous to the accused;[2] Dr. Brock concluded that Knohl was able to testify but thought that the question of Knohl's ability to testify without dangerous consequences should be passed upon by an internist who was an

---

2. Letters from a Dr. Kershner and two others of Knohl's personal physicians were also filed in which they generally expressed agreement with the opinions of Drs. Dolger and Frieden.

expert in cardio-vascular disease and hypertension. The other two doctors agreed with this suggestion and the three so reported to Judge Croake who appointed Dr. Eugene Clark, a cardiologist. Up to this time none of the medical opinions of appellant's own personal doctors said anything about his mental or physical capacity to assist counsel in his defense but dealt only with the risk of another stroke or other serious consequences to the accused.

On June 29, 1966 Dr. Clark's report was submitted to Judge Herlands, to whom the case had meanwhile been assigned. Dr. Clark concluded that Knohl's state of health did not preclude his standing trial if the proceedings commenced shortly thereafter and lasted no more than a week or two.

"Concerning Mr. Knohl's physical fitness to stand trial in the immediate future, which I understand may require his presence in court for at least a week or two, it is my opinion that his state of health does not preclude this.

I would agree that Mr. Knohl's appearance in court does involve some risks, but I don't believe that the risk is extreme, and I am reasonably certain that the risk will be none the less a few months from now or at any other subsequent time."

Dr. Clark's determination that the risks from the emotional stress of a trial might be greater, rather than less, if there were a delay, was based on the prognosis that appellant's cardiac status was likely to worsen, that his hypertension could not be expected to improve and that no further improvements in the neurologic defects caused by appellant's stroke were to be anticipated.

At about the same time, the appellant formally moved for an adjournment of the trial until September, and argument was had before Judge Herlands on June 30. The application was made on the grounds that counsel for appellant had not had sufficient time to prepare for trial, that appellant's illness was such that a trial might result in his death,

and, in addition, his condition made it impossible for him to consult with counsel in preparation of his defense, and that appellant's counsel was himself unable to conduct a trial in the summer for reasons of his own health and would be forced to resign if no adjournment were granted. Appellant also requested that an evidentiary hearing be held so that a judicial determination could be made about his physical and mental condition.

On June 30, Judge Herlands filed a memorandum of decision denying an adjournment and setting July 5 as the date for trial. His decision was based primarily on the report of Dr. Clark. On the subject of a hearing, Judge Herlands noted that it was within the discretion of the judge who was to try the case to decide whether or not further medical testimony should be heard on the physical and mental capability of the accused to stand trial and assist in his own defense.

The case was assigned to Judge Murphy and on July 5 counsel for appellant renewed his application to adjourn the case until September, basing it upon the same grounds as those presented to Judge Herlands. Judge Murphy heard the parties at length. Defense counsel filed a letter from a Dr. Myers reporting a recent physical examination of the accused from which he concluded that putting Knohl on trial would endanger his life and that his mental and physical conditions would make "difficult, and very likely pointless, proper consultation with his counsel." Judge Murphy agreed to treat the letter as if Dr. Myers had been present and had so testified. The request for a continuance was denied and the case was set for trial on the following morning. Appellant's counsel, however, said that he would renew the matter at noon recess on July 6 when he would try to have the doctor testify. This was not objected to by the Government nor did the court say that it would not hear him, but on July 6th, the defense did not renew the request or offer the doctor as a witness. The trial began on July 6, and continued (except for July

8, 9, 10, 12, 15, 16 and 17 when the trial was recessed) until July 18, when the jury brought in the verdict of guilty—a total of 6 trial days.

The appellant claims on appeal that the medical reports in the record demonstrate that he "was neither mentally nor physically able to stand trial and assist counsel in his own defense," and that the trial judge should have held an evidentiary hearing.

The Government, on the other hand, in addition to denying the assertion that the appellant was not competent to stand trial, contends that the procedures for determining capacity to stand trial are those enumerated in 18 U.S.C. § 4244[3] and that, since the reports of neither of the two court-appointed physicians, Drs. Brock and Clark, "indicated" incompetence, no hearing was required.

█ It is well settled that a defendant, who has been convicted while he is incompetent to stand trial, has been deprived of due process. See, e. g., Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835, vacating and remanding, 96 U.S.App.D.C. 117, 223 F.2d 582 (1955) (mental incompetency); United States ex rel. Rizzi v. Follette, 367 F.2d 559 (2 Cir. 1966) (mental incompetency); Clark v. Beto, 359 F.2d 554 (5 Cir. 1966) (mental incompetency; adopts dicta of Sanders v. Allen, infra); Rollerson

v. United States, 343 F.2d 269 (1964) (mental incompetency); Sanders v. Allen, 69 U.S.App.D.C. 307, 100 F.2d 717, 720 (1938) (mental incompetency and dicta re physical incompetency).

█ In general the granting or denying of a petition for a continuance on the ground that the accused is incompetent to stand trial lies in the sound discretion of the trial judge.[4] See United States v. Armone, 363 F.2d 385, 402 (2 Cir.), cert. denied 385 U.S. 957, 87 S. Ct. 398, 17 L.Ed.2d 303 (1966); United States v. Shotwell Mfg. Co., 287 F.2d 667, 672 (7 Cir. 1961), aff'd on other grounds 371 U.S. 341, 83 S.Ct. 448, 9 L. Ed.2d 357 (1963); Stein v. United States, 263 F.2d 579 (9 Cir. 1959); United States v. Alker, 260 F.2d 135 (3 Cir. 1958), cert. denied 359 U.S. 906, 79 S. Ct. 579, 3 L.Ed.2d 571 (1959); Wellman v. United States, 227 F.2d 757, 775–776 (6 Cir. 1955), vacated on other grounds, 354 U.S. 931, 77 S.Ct. 1403, 1 L.Ed.2d 1535 (1957).

The trial court concluded in the present case, on the basis of written reports of physicians and Knohl's own appearance before the court but without a hearing at which oral testimony could be presented, that Knohl was not so physically or mentally disabled that he was rendered incompetent to stand trial. The question before us is, therefore, whether

---

**3.** 18 U.S.C. § 4244 provides:

"Whenever after arrest and prior to the imposition of sentence * * * the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least

one qualified psychiatrist, who shall report to the court. * * * If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. * * *"

**4.** In applying this section an accused is considered to have sufficient mental capacity to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and * * * has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

under the circumstances the trial judge erred in requiring the accused to stand trial without first having held a hearing on his competency.

When a defendant asserts mental incompetency between the time of his arrest and the time when he is sentenced, his petition for continuance comes within the provisions of § 4244 of Title 18 U.S.C.

The appellant did not in this case petition the trial court during that period before sentencing pursuant to § 4244 because he asserts that he was invoking an overriding due process right enunciated by the Supreme Court in Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966) which he claims cannot be frustrated by requiring him to follow § 4244. The Pate case was concerned with the failure of the courts of the State of Illinois to provide the petitioner with a fair trial, which they could have given him by carrying out the terms of the State's own statute which required "a sanity hearing where the evidence raised a bona fide doubt" as to a defendant's competence to stand trial. The case did not create any new federal right or a new procedure for applying for a hearing in the federal courts on the issue of mental competency to stand trial. Moreover, § 4244 was not enacted in contravention of due process but in aid of it.

Where the motion is made as in the present case just prior to the trial, § 4244 is the exclusive procedure prescribed for the purpose. Unlike § 4245 which applies to a prisoner after conviction and incarceration, § 4244 may be invoked by the accused or by anyone on his behalf, and a duty rests upon both the prosecution and the court to comply with it, once it has come to their attention that there is reasonable ground to believe that the accused is mentally incompetent to the degree described in the statute. It does not depend upon action by an administrative board or other official before the petitioner can even be heard in court, as is the case with § 4245. United States v. Cannon, 310 F.2d 841 (2 Cir. 1962). To hold that § 4244 is the appropriate and exclusive procedure to be followed in cases of this kind, however, does not mean that one, who for some reason has been arbitrarily or otherwise erroneously prevented from invoking, or who is unable to invoke, § 4244 during the period in which it applies or whose evidence of mental incompetency is not discovered until after he has been convicted and sentenced, cannot attack the sentence collaterally. United States v. Brown, 335 F.2d 170, 173 (2 Cir. 1964). Pate v. Robinson, supra, makes clear, that such collateral attack may be made.

In the present case the parties, with the apparent approval of the trial court, stipulated or agreed upon certain procedures which were a rough approximation of those in § 4244, although the appellant never formally moved under that section, perhaps because it involved the risk of temporary confinement in a hospital for the mentally ill. At any rate the trial court considered that its initial task was to decide preliminarily whether it had before it sufficient information to cause it reasonably to believe that the accused might be mentally incompetent to stand trial so that a hearing with the taking of oral testimony was called for. Its decision on this point rested principally on the report of Dr. Brock, the appointment of whom the parties accepted in lieu of a psychiatrist and who made a report on the neuro-psychiatric phases of the case. In view of the procedure followed we have also considered other evidential matter offered to the trial court by the defendant. It consisted only of affidavits by the defendant and by his counsel stating that the accused had suffered a loss of memory. The only medical testimony touching upon the subject by any of the defendant's own private doctors was the last minute report from Dr. Meyers who said,

> "His mental and physical condition makes proper consultation with his counsel in the preparation of his case extremely difficult and very likely fruitless."

What purports to be Knohl's affidavit states that he had difficulty in remembering accurately anything connected

with the facts of the present case. To offset the fact that he made innumerable other statements in the affidavit which obviously required the exercise of a competent memory, he says that he didn't prepare the affidavit and that it only "seems to be an accurate representation of the facts." The affidavit of counsel said the defendant's memory was very poor and made preparation for trial and consultations with counsel "almost an impossible task." Dr. Myers' report was entirely conclusory and furnished no factual basis whatever for his assertion that Knohl's mental condition made "proper consultation with his counsel in preparation of his case extremely difficult. * * *" The affidavits and Dr. Myers' report are not sufficient to require the trial judge to hold a hearing with oral testimony on the issue of mental incompetency to stand trial. Dr. Brock's report, dated June 14, 1966, reiterated the neuro-psychiatric opinion rendered by him on May 10, 1966 in which he said that Knohl was "well oriented, alert and responsive and his behavior for the most part is normal (except for the occasional over emotional episode)" and "gave no evidence of reduction in his ordinary intellectual capacities." In the second report Dr. Brock said, "I believe he is able to stand trial." Where the defendant complains of nothing more than memory difficulties, there is inadequate ground for holding an accused incompetent to stand trial. There was, therefore, insufficient evidence in this case to require a hearing as to the defendant's mental incompetence to stand trial and the court below was not in error in denying the defendant's

motion for a hearing. Hawks v. Peyton, 370 F.2d 123, 125 (4 Cir. 1966); United States v. Wilkins, 334 F.2d 698, 703 (6 Cir. 1964); Caster v. United States, 319 F.2d 850, 852 (5 Cir. 1963).

■ With regard to the appellant's claim that he was physically incapable of standing trial and that he was unable properly to assist his counsel in the preparation of the case and in the trial itself, the trial court was presented with affidavits and reports of physicians which showed that the accused, just prior to the trial, was suffering from serious illness and some physical incapacity. Defense counsel, because of this, requested that the case be continued until the following September. A motion for continuance based on a claim of *physical* disability does not come within 18 U.S.C. § 4244 or the procedures therein prescribed.[5] See United States v. Armone, supra. A procedure was adopted, however, by the agreement of the parties and with the approval of the court, which called for re-examination of the accused by Dr. Brock, who reported that Knohl was able to testify. Knohl's personal physicians were of the opinion that the strain and stress of a trial would be likely to bring about another stroke and thus endanger the life of the accused. They continued to adhere to this view in spite of Dr. Brock's conclusions. At the end of his report Dr. Brock had agreed that Knohl's ability to testify without dangerous consequences was the central and determinative medical problem, and he made the recommendation that this question should be passed upon by an expert in cardiovascular disease and hyperten-

---

5. The construction of § 4244 is disjunctive, i. e., that inability to properly assist in his own defense is enough to prevent one from going to trial even without a finding that he is unable to understand the proceedings against him. But cf. United States v. Sermon, 228 F.Supp. 972, 980 (W.D.Mo.1964). Its language makes it clear, however, that Congress was concerned solely with the question of mental incompetence; the section only comes into play when the defendant is "so mentally incompetent as to be unable to

properly * * * assist in his own defense." See 1949 U.S.Code Cong.Serv. p. 1928. See also 18 U.S.C. § 4246, providing that, "[w]henever the trial court shall determine in accordance with [§ 4244] that an accused is or was mentally incompetent, the court may commit the accused to the custody of the attorney general * * * until the accused shall be mentally competent to stand trial * * *" Commitment procedures, of course, are not relevant to the question of physical infirmity.

sion. Knohl's personal physicians agreed. The Government and the defense then adopted the procedure of requesting the trial judge to appoint such an expert, and Judge Croake appointed Dr. Clark. Judge Murphy, in considering, some days later, whether a hearing should be held with the taking of oral testimony was justified in believing that this action by the parties and the doctors implied that the physicians themselves did not believe that they possessed the necessary qualifications to reach a determinative opinion on this crucial point. Dr. Clark reported that Knohl's state of health did not preclude his standing trial. The defense did not offer evidential material or reports from any other medical expert whom they claimed had comparable qualifications on the principal question with those of Dr. Clark. None of the defendant's personal physicians gave an opinion as to Knohl's ability to assist counsel in his defense except for the last minute letter from Dr. Myers, whose report was, in this regard, entirely conclusory, supported by nothing and couched in language strongly suggestive of the promptings of counsel.

 We believe it will usually be the better course, where there is reasonable ground to believe that physical disability may prevent a proper defense or endanger the life of a defendant, for the trial court to hold an evidentiary hearing as close to trial as practical. Such a procedure will allow cross-examination of the examining doctors and preserve a full record. This is particularly true in a multi-judge court where, as here, the issue may present itself for determination before four different judges in little over a month. However, we cannot say, in the light of the procedures agreed upon by the Government and the defense and the nature of the evidential material submitted to Judge Murphy, that he abused his discretion in denying the motion for such a hearing. Cases are indeed scarce in which a reviewing court has found an abuse of discretion on the part of a trial judge who has ruled upon an accused's claim that he was *physically* incompetent to stand trial. The judge's own observation of the accused and the opportunity to adjust the trial itself to needs of one suffering physical disability by shortening court sessions, affording the accused periods of rest and having present such medical and nursing aids and attendants as may be needed, give particular cogency to the trial court's estimate of the circumstances and to its disposition of the matter.

On review, this court with the advantage of hindsight, is fully persuaded that Judge Murphy's disposition of the motion was correct. The trial actually took six trial days instead of the three weeks or approximately 15 trial days estimated by defense counsel. The record, from the time the trial started to its conclusion, is barren of any instance which indicated that the appellant was suffering any ill effects from the trial or was unable to assist his counsel in his defense. There was no request for a recess or rest period and no extra time sought for consultation. Defense counsel had claimed at the motion for a hearing that he himself was in precarious health and that if forced to conduct the trial he would do so only at the risk of his own life and would, therefore, resign as counsel rather than go forward. Mende v. United States, 282 F.2d 881, 884 (9 Cir. 1960); Stein v. United States, 271 F.2d 895 (9 Cir. 1959). He did, however, continue to represent the accused throughout the trial and, like the accused, apparently survived it without suggestion of physical collapse or untoward consequences.

 The prosecution's case was based largely upon the evidence given by Mrs. Fuller and it is in the attack on her testimony that a lack of assistance by the accused to his counsel would most likely appear. She was cross-examined for two days by defense counsel, covering 350 pages of the transcript. It was searching and complete and indicated that defense counsel was thoroughly familiar with the events involved in the case. An abuse of discretion will call for a reversal only where there is a showing that the defendant's ability to defend himself

was substantially impaired. United States v. Ellenbogen, 365 F.2d 982, 985 (2 Cir. 1966), cert. denied 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967). We are aware that the record in itself does not always fully reveal whether an accused was substantially denied a fair opportunity to prepare and conduct his defense. There may have been other evidence or sources of evidence disclosed or other theories which would have suggested themselves, but the appellant mentions no specific instance where some line of inquiry or development of theory of substantial importance to the defense was baulked or frustrated because counsel could not get assistance from the accused. Moreover, there is nothing from which such injury can be inferred. Cf. Avery v. State of Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); United States v. White, 324 F.2d 814 (2 Cir. 1964). We are satisfied that we would be unwarranted under the circumstances of this case to hold that Judge Murphy abused his discretion in denying the appellant a hearing with oral testimony on the question of his mental and physical capacity to stand trial and assist counsel in his defense.

Knohl also appeals from the admission of certain evidence. The first concerns testimony of Mrs. Fuller about a conversation she had with Knohl on October 8, 1965 in which, in substance, Knohl asked her to cash for him twenty additional $100,000 Treasury bills; and told her that he had two or three million dollars worth of securities all of which, including the twenty Treasury bills, came from the same source as the six which she had already cashed. Defense counsel objected on the ground that this injected into the trial, evidence "of a series of other crimes in which Knohl was allegedly involved, bearing no relation to the issues presented." After his objection was overruled, he made motions to strike and for a mistrial, which were also overruled.

On the admissibility of evidence of prior offenses the Supreme Court in Spencer v. State of Texas, 385 U.S. 554, 560, 87 S.Ct. 648, 652, 17 L.Ed.2d 606 (1967) summarized the rule as follows:

"Because such evidence is generally recognized to have potentiality for prejudice, it is usually excluded except when it is particularly probative in showing such things as intent, Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Ellisor v. State, 162 Tex.Cr.R. 117, 282 S.W.2d 393; an element in the crime, Doyle v. State, 59 Tex.Cr.R. 39, 126 S.W. 1131; identity, Chavira v. State, 167 Tex.Cr.R. 197, 319 S.W.2d 115; malice, Moss v. State, 364 S.W.2d 389; motive, Moses v. State, 168 Tex.Cr.R. 409, 328 S.W.2d 885; a system of criminal activity, Haley v. State, 87 Tex.Cr.R. 519, 223 S.W. 202; or when the defendant has raised the issue of his character, Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168; Perkins v. State, 152 Tex. Cr.R. 321, 213 S.W.2d 681; or when the defendant has testified and the State seeks to impeach his credibility, Giacone v. State, 124 Tex.Cr.R. 141, 62 S.W.2d 986."

Although these citations are largely to Texas authorities, the footnote appended to this portion of the Supreme Court opinion says:

"7. These Texas cases reflect the rules prevailing in nearly all common-law jurisdictions. See generally McCormick, Evidence §§ 157–158 (1954 ed.); 1 Wharton's Criminal Evidence §§ 221–243 (Anderson ed. 1955); 1 Wigmore, Evidence §§ 215–218 ([3d ed. 1940 and] 1964 ed.); Note, Other Crimes Evidence at Trial, 70 Yale L.J. 763 (1961). * * *"

This court has frequently had occasion to rule accordingly. United States v. Bozza, 365 F.2d 206 (2 Cir. 1966); United States v. Marquez, 332 F.2d 162 (2 Cir. 1964); United States v. Kahaner, 317 F.2d 459 (2 Cir. 1963).

Even in cases in which the evidence is offered to prove one of the enumerated exceptions to the general rule, its probative value may be very

slight while its prejudicial character may be very strong. Under such circumstances the trial judge has a duty in the exercise of his discretion, to exclude it. Spencer v. State of Texas, supra, 385 U.S. at 561, 87 S.Ct. 648, 17 L.Ed.2d 606; United States v. Byrd, 352 F.2d 570, 574 (2 Cir. 1965). The present case is not of that kind. Although the appellant asserts that the evidence objected to and the Government's references to it in its argument were inflammatory to the jury and highly prejudicial, we are not persuaded that this was so. Moreover, we hold that the evidence was properly admitted. In the first place the testimony was directly relevant to the circumstances concerning the source of the Treasury bills and the likelihood that Knohl knew that they were stolen. In the second place, it indicated that Knohl was a large-scale dealer in stolen securities and that he therefore had a very strong motive to induce Mrs. Fuller not to disclose that he was the source of the Treasury bills and to persuade her to perjure herself before the Grand Jury. United States v. Marchisio, 344 F.2d 653 (2 Cir. 1965);[6] United States v. Kahaner, supra. Any prejudice the defendant may have suffered from this evidence was more than compensated for by the court's charge which was altogether too favorable to the defendant because it, in effect, told the jury to disregard the testimony of Knohl's possession of other securities.[7]

The appellant also argues that the admission into evidence, as Government's Exhibit 48, of what is referred to as the "Brodsky tape"—a tape recording made on August 25, 1965 by Mrs. Fuller, without appellant's knowledge, of a conversation in her apartment between herself, the appellant and Attorney Brodsky—was reversible error. Mrs. Fuller testified that she had placed the microphone in her living room and the recorder, to which it was attached, in another room. When she heard the appellant ring her doorbell she started the machine, so that all of the conversation which took place in the living room on that occasion was recorded.[8] The evidence showed that Mrs. Fuller took the tape recording to Agent Goss at the F.B.I. offices on September 10, 1965, where she permitted him to make a copy of it by playing it to another tape recorder. The original tape was taken away by Mrs. Fuller, because she refused to relinquish possession of it. It was agreed, however, for security purposes, to place the recording in a safe deposit box, supplied by the F.B.I. but to which Mrs. Fuller kept the only keys. About a week later, at Agent Goss's request, Mrs. Fuller brought the tape once again to his office for the purpose of making another copy by a method which would eliminate background copying

---

6. In the *Marchisio* case the defendants had been involved in embezzlement schemes and were indicted and tried for perjury, for making false statements to federal agents and for conspiring to do both. In discussing testimony about their earlier *diversion of funds*, the court said, "The fact that the appellants * * * participated in * * * [a scheme to divert funds], in view of their denial of such an arrangement, would provide a motive for these same persons also to participate in conspiracies subsequent * * * [to the diversion of funds] to conceal that venture." 344 F.2d at 667.

7. "I have been asked by the defendant to charge you *with reference to testimony* in the case that relates to Knohl's possession of other securities. With reference to such testimony, such possession of

such securities, if you accept that testimony, is no proof whatsoever that the defendant committed the crime charged in this indictment and, also, the testimony that there was some kind of a tax lien by the Government against him, of course, has no bearing on the ultimate question. Such testimony is not proof in any manner or form that he committed the crime of which he stands accused."

8. On cross-examination, Mrs. Fuller testified that she had erased the conversation recorded on August 25th from a few feet of the tape and talked over it, that is, recorded an irrelevant statement of her own onto the erased space. The reason she gave for doing so was that the portion erased was "some personal remark" which was "some insignificant conversation" and "not important."

noises. The attempt was abortive because the F.B.I.'s equipment was faulty and the tape was returned to Mrs. Fuller, who took it home. In March of 1966, when Mrs. Fuller was requested to return with the tape recording of the August 25th conversation, she was unable to find it. She testified that she did not destroy it or throw it away and that she had no knowledge of what happened to it. Government Exhibit 48 was a copy made from the September 10, 1965 copy, and identical in all respects except that it had been filtered to eliminate background noises.

The appellant claims that Exhibit 48 was inadmissible because it violated the best evidence rule and because it was not authenticated.

Where a re-recording of a tape recorded conversation is offered in evidence and the trier finds that a proper foundation has been laid for it, and that the re-recording is authentic and accurate, a technical and rigorous application of the best evidence rule makes no sense and is not required. Johns v. United States, 323 F.2d 421 (5 Cir. 1963). The discussion of the rule by Mr. Justice Sutherland, sitting as a Circuit Justice in the Second Circuit, in United States v. Manton, 107 F.2d 834, 845 (2 Cir. 1939) is pertinent:

"The rule is not based upon the view that the so-called secondary evidence is not competent, since, if the best evidence is shown to be unobtainable, secondary evidence at once becomes admissible. And if it appear, as it does here, that what is called the secondary evidence is clearly equal in probative value to what is called the primary proof, and that fraud or imposition, reasonably, is not to be feared, the reason upon which the best evidence rule rests ceases, with the consequence that in that situation the rule itself must cease to be applicable, in consonance with the well established maxim—cessante ratione legis, cessat ipsa lex.

An over-technical and strained application of the best evidence rule serves only to hamper the inquiry without at all advancing the cause of truth."

We are not unmindful, however, that tape recordings are susceptible to alteration and that they often have a persuasive, sometimes a dramatic, impact on a jury. It is therefore incumbent on the Government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings; and where the court accepts them as authentic and accurate but the evidence is conflicting on these points, it must caution the jury to scrutinize the evidence with care.

In the present case there was very substantial evidence of authenticity and accuracy in the testimony of Mrs. Fuller and Attorney Brodsky, supplemented by the testimony of F.B.I. Agent Goss. No contradictory evidence was offered by the defense except what was brought out on cross-examination. Its attack consisted mainly of arguments of counsel suggesting large scale skulduggery on the part of the Government's witnesses in altering the tapes. The appellant also complains that the copy was defective because background noises were filtered out without determining whether or not at the same time low pitched voices were removed and that portions of the recording were missing; but the fact that part of a tape recording is missing or inaudible does not render it inadmissible. See, Addison v. United States, 317 F.2d 808, 815 (5 Cir. 1963); United States v. Schanerman, 150 F.2d 941 (3 Cir. 1945); Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49, 55, cert. denied 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956). The question of whether so much of a tape recording is inaudible or the circumstances surrounding it are so suspicious and make it so untrustworthy that it should not be admitted into evidence in the first place is addressed to the discretion of the trial judge. See United States v. Madda, 345 F.2d 400, 403 (7 Cir. 1965); Johns v. United States, 323 F.2d 421 (5 Cir. 1963); Gorin v. United States, 313 F.2d 641, 652 (1 Cir. 1963); Cape v. United

States, 283 F.2d 430, 435 (9 Cir. 1960); Monroe v. United States, supra 234 P.2d at 55; United States v. Schanerman, supra 150 F.2d at 944. In the present case the trial judge, after hearing the parties on the defendant's objection, admitted the tape into evidence. He did not thereby commit an abuse of discretion. Thereafter the jury, after hearing testimony and arguments relative to the reliability and accuracy of the tape and under proper instructions from the court, reached its own conclusion on that issue. The jury obviously believed the explanations given by the Government's witnesses, which it had a right to do.

 Moreover, as far as the best evidence rule is concerned, a well recognized exception is that secondary evidence may be admitted in lieu of the original provided the original has not been lost, destroyed or become unavailable through the fault of the proponent and provided the copy does not otherwise appear to be untrustworthy. See Sylvania Electric Products, Inc. v. Flanagan, 352 F.2d 1005 (1 Cir. 1965); McCormick, Evidence § 196 (1954); 4 Wigmore, Evidence § 1192 (3d ed. 1940). In the present case the unavailability of the original was established through the testimony of Mrs. Fuller and there was ample evidence to support the finding that it was not the Government, who was the proponent, that was at fault in the loss of the original, but Mrs. Fuller herself.

 The appellant asserts that the Government was so grossly negligent in leaving the tape in Mrs. Fuller's custody that its loss should be held to be the fault of the Government. The tape belonged to Mrs. Fuller and she insisted on keeping it. Under the circumstances the Government had no duty to bring process against the witness who had fully and freely responded to interrogation and on whom it chiefly relied in proving its case, any more than it had a duty to have her held in a lock-up as a material witness.

While the Government's procedures for insuring the safekeeping of the tape were hardly adequate, the trial court was not in error in refusing to exclude the Brodsky tape on any of these grounds.

The appellant further claims that the Government had a duty to disclose to him prior to trial the existence of the tape recordings, particularly the "Brodsky" tape, and, because it failed to do so, his conviction should be reversed.

On May 24, 1966 the defendant had moved under Rule 16 of the Fed.R. Crim.P. for discovery. The trial court granted the motion, but at that time the defendant neither knew of the existence of the tape recordings nor could he have had them disclosed under Rule 16, as it was then worded,[9] even if he had known about them. United States v. Murray, 297 F.2d 812, 820 (2 Cir.), cert. denied 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962); Shores v. United States, 174 F. 2d 838, 843 (8 Cir. 1949).

 Under the amended rule, which became effective July 1, 1966, an accused can apply to the court under 16(a) (1) [10] for leave to inspect and copy tape record-

9. "Upon motion of a defendant at any time after the filing of the indictment or information, the court may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, obtained from or belonging to the defendant or obtained from others by seizure or by process, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. The order shall specify the time, place and manner of making the inspection and of taking the copies or photographs and may prescribe such terms and conditions as are just."

10. "Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government * * *."

ings of his own statements, in the possession of the Government,[11] and it rests in the discretion of the trial judge whether or not disclosure should be ordered. Though the new Rule 16(a) (1) may be applied to pending cases, the defendant made no further motion after its effective date.[12] In any event, he was in no way prejudiced by not having the opportunity to inspect and copy the recordings in advance of trial, because his counsel received them several days before their introduction into evidence to allow him to meet or attack their admissibility in whatever way he deemed necessary.[13] We find no error based upon appellant's claim that the Government wrongfully failed to disclose or produce.

 The appellant also seeks a reversal on the ground that he was deprived of rights protected by the Fourth, Fifth and Sixth Amendments by the admission into evidence of surreptitious recordings of statements made by him to Mrs. Fuller after September 10 and 17, 1965. His argument rests, *inter alia,* on the contention that, after Mrs. Fuller's Grand Jury testimony and no later than the dates on which she played her tape recordings of his statements for the F. B. I., he became the "target of an investigation" and was entitled to be advised of his rights to be silent and to have the presence of counsel before any statements he made could be used against him. He adds that, at least after September-

ber 17th, Mrs. Fuller was somehow acting in the capacity of a Government "agent."

These arguments have little force, however, because the Supreme Court's recent decision in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, (1966) makes it clear that its holdings in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, (1964), and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), were never intended to go so far. See also United States ex rel. Molinas v. Mancusi, 370 F.2d 601 (2 Cir. 1967), cert. denied 386 U.S. 984, 87 S.Ct. 1285; 18 L.Ed.2d 232; Hurst v. United States, 370 F.2d 161 (5 Cir. 1967).

 In the *Hoffa* case the defendant's similar Fifth Amendment claim was rejected for a reason that applies with equal force here and that is that "a necessary element of compulsory self-incrimination is some kind of compulsion," 385 U.S. at 304, 87 S.Ct. at 414, a factor which is completely lacking in the present case. Even if Mrs. Fuller could be considered a Government agent, still without compulsion the privilege against self-incrimination is not violated.

 The same authorities make it clear that the Sixth Amendment does not prohibit the use of pre-arrest statements in the absence of counsel even though

---

11. See Notes of the Advisory Committee on Rules, printed in 8 Moore, Federal Practice ¶ 16.07 [2] (1966). The notes to the new version of Rule 16 [i. e., 16 (a)] state that "the defendant is not required to designate [which statements of his he seeks] because he may not always be aware that his statements or confessions are being recorded."

12. In promulgating the Rules, the Supreme Court issued the following order:
"That the foregoing amendments and additions to the Rules of Criminal Procedure shall take effect on July 1, 1966, and shall govern all criminal proceedings thereafter commenced and so far as just and practicable all proceedings then pending."
383 U.S. 1089 (1966).

13. During the first day of the trial Mrs. Fuller's testimony disclosed the existence of the tape recordings. Both the recordings and the transcripts of them were turned over to appellant's counsel for his inspection. After the first two days of trial (Wednesday and Thursday) the court adjourned the case until Monday, so that he could spend Friday and the week-end listening to the tapes. Trial resumed on Monday, but it was not until Wednesday, July 13, that the tapes were played for the jury, by which time counsel for appellant had ample time to consider and act on the material presented.

the agents had enough evidence to make an arrest. Hoffa v. United States, supra; United States ex rel. Molinas v. Mancusi, supra; Hurst v. United States, supra.

 The Fourth Amendment claim does not, as in *Hoffa*, involve governmental intrusion into a constitutionally protected area, because, as far as we can determine, the testimony and evidence complained of relate to conversations which took place in Mrs. Fuller's apartment. The Fourth Amendment protects conversation only against the "surreptitious eavesdropper"; it does not protect a "wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." Hoffa v. United States, supra 385 U.S. at 302, 87 S.Ct. at 413; Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312, (1966). Moreover, the fact that Mrs. Fuller was surreptitiously recording the appellant's statements by means of a hidden mechanical device did not infringe the appellant's rights, because she thereby "obtain[ed] the most reliable evidence possible of a conversation" in which she was a participant and which she was free to disclose through her testimony—circumstances similar to those in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462, (1963). See also United States ex rel. Molinas v. Mancusi, supra 370 F.2d at 602–603; Hurst v. United States, 370 F. 2d supra at 165.

 Equally lacking in merit is appellant's final argument that a conviction under 18 U.S.C. § 1503 must be supported by the testimony of at least two witnesses that the assertedly false statement which the appellant sought to procure was in fact false. He asserts that because two witnesses are required to testify to the falsity of testimony in a prosecution for perjury, 18 U.S.C. § 1621, and for subornation of perjury, 18 U.S.C. § 1622, the same rule should apply to the present case. As the Court of Appeals for the Ninth Circuit concluded in rejecting the same argument in Ca-

trino v. United States, 176 F.2d 884 (9 Cir. 1949), the position is untenable because the crimes are essentially different. It is a necessary element of both the crimes of perjury and subornation of perjury that the false testimony be given under oath and it is the falsity of swearing or the formal affirmation which must be established by the testimony of two credible witnesses or one such witness plus corroborating circumstances. See Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945); Hammer v. United States, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118 (1926). Section 1503, however, punishes merely the endeavor to obstruct justice; it is not necessary that the defendant succeed in his attempt for a conviction to be sustained. See United States v. Russell, 255 U.S. 138, 143, 41 S.Ct. 260, 65 L.Ed. 553 (1921); Roberts v. United States, 239 F.2d 467, 470 (9 Cir. 1956); Catrino v. United States, supra 176 F.2d at 886.

The judgment of conviction is affirmed.