**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1422
_____

UNITED STATES OF AMERICA

v.

JUSTIN MICHAEL CREDICO

Justin Credico,
                    Appellant
_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(E.D. Pa. No. 2-14-cr-00118-001)
District Judge:  Honorable Cynthia M. Rufe

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 14, 2017

Before:  CHAGARES, RESTREPO, and FISHER, Circuit Judges.

(Filed: December 18, 2017)
_____

OPINION[*]
_____

_____

   [*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

CHAGARES, Circuit Judge.

Defendant Justin Credico appeals from his conviction after a jury trial for threatening federal agents and their immediate family members, in violation of 18 U.S.C. § 115(a)(1). Credico challenges the District Court's admission of the cassette tape recording of his threatening voicemails, the sufficiency of the Government's evidence that he violated § 115(a)(1), and the District Court's jury instructions. Because we conclude that none of these claims are meritorious, we will affirm.

I.[1]

Beginning around 2008 and culminating on February 4, 2014, Credico made hundreds of phone calls to the FBI — and to Special Agent Joseph Milligan in particular — many of which expressed Credico's anger at the FBI and at Milligan, who Credico believed was responsible for his expulsion from West Chester University. Although the messages were vexatious and often belligerent, no official action was initiated against Credico until the instant case, which was precipitated by a series of voicemail messages that Credico left for Milligan on the night of February 4, 2014 and that Milligan listened to on the morning of February 6, 2014. The content of those messages — which the Court will not recount in full, but which included graphic threats to murder Milligan and defile his corpse, murder Special Agent Jim Fitzgerald, rape Milligan's wife, and anally rape Fitzgerald's daughter (whom Credico referenced by name) — was sufficiently alarming that Milligan reported the calls to his supervisor, discussed the threats with his

---

[1] We write for the parties and so recount only the facts necessary to our decision.

family, and even notified the police in the community where he lived. After hearing the messages, Milligan had Special Agent Kevin Lewis help make a cassette tape recording of all eight messages that were in Milligan's voicemail inbox that morning, and Milligan brought the tape to an Assistant United States Attorney to determine whether Credico had committed a crime.

On March 11, 2014, Credico was charged with four counts of making threats against federal agents and their family members, in violation of 18 U.S.C. § 115(a)(1). As relevant, § 115(a)(1) makes it a felony to "threaten[] to assault, kidnap or murder" a "Federal law enforcement officer" or "a member of [their] immediate family," "with intent to impede, intimidate, or interfere with such . . . law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such . . . law enforcement officer on account of the performance of official duties." Prior to trial, Credico challenged the admissibility of the tape recording and requested an evidentiary hearing pursuant to our decision in United States v. Starks, 515 F.2d 112 (3d Cir. 1975). After holding an evidentiary hearing — which was twice reopened due to some inconsistencies in the Government's evidence — the District Court determined that the tape was admissible. A jury found Credico guilty of all counts and the District Court sentenced Credico to 70 months of imprisonment, followed by three years of supervised release, along with a special assessment and fine. Credico timely appealed.

II.[2]

Credico first argues that the District Court improperly admitted the audio cassette recordings of his voicemails. We review a District Court's decision to admit evidence for abuse of discretion. United States v. Green, 556 F.3d 151, 155 (3d Cir. 2009). In Starks, we recognized the risks inherent in the use of tape recordings, which are "peculiarly susceptible of alteration, tampering, and selective editing," and held therefore that the Government must "produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings." United States v. Starks, 515 F.2d 112, 121 (3d Cir. 1975) (quoting United States v. Knohl, 379 F.2d 427, 440 (2d Cir. 1967)). In so doing, we noted with approval a seven-part test[3] for establishing such a foundation, but were explicit that we did not intend to establish "a uniform standard equally applicable to all cases." Id. We instead explained that, within reason, whether the "proof of facts creat[es] a sufficient foundation for the admission of a tape recording is a matter to be decided by the trial court." Id.

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

[3] The factors for the court to consider are:

(1) That the recording device was capable of taking the conversation now offered in evidence. (2) That the operator of the device was competent to operate the device. (3) That the recording is authentic and correct. (4) That changes, additions or deletions have not been made in the recording. (5) That the recording had been preserved in a manner that is shown to the court. (6) That the speakers are identified. (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

Starks, 515 F.2d at 121 n.11 (quoting United States v. McKeever, 169 F. Supp. 426, 430 (S.D.N.Y. 1958)).

Credico takes issue with the District Court's determination that, under the third Starks factor, the Government adequately showed that the tape was "authentic and correct," and further asserts that the Government failed properly to establish the tape's chain of custody. At the Starks hearing, Milligan testified that the recordings on the tape were the same as those that he heard on his voicemail on February 6, 2014, explained how he and Lewis recorded the voicemail directly onto the cassette and removed the tabs from the cassette to ensure it could not be recorded over, certified that neither he nor anyone else altered the voicemails before making the recording, and — pointing to various markings made contemporaneously on the cassette's label — identified the tape as the one he used to make the recording on February 6, 2014.

Credico's attempts to undermine the tape's authenticity rely largely on (1) Milligan's failure to remember a highly specific comment that Credico made in the voicemails, which was unrelated to the threats against Milligan or Fitzgerald and (2) Credico's expert's testimony that the method of recording was suboptimal and precluded him from asserting definitively that the tape was not altered. Neither of these objections convince us that the District Court abused its discretion in finding the tape authentic and accordingly admissible under Starks. First, considering the exceedingly graphic nature of the voicemails, Milligan's failure to remember otherwise insignificant details does not undermine his testimony that the tape "is what it is claimed to be." Fed. R. Evid. 901(b)(1). Second, Credico's complaint that Milligan should have used the FBI's digital audio storage system rather than a tape recorder is academic. Surely, audio stored on cassette tapes is not per se inadmissible merely because it is not in a digital

5

form capable of being tested in the manner Credico desired; <u>Starks</u> itself involved such an antiquated medium.  Absent any evidence that the tape was tampered with — a claim Credico assiduously avoids — the mere fact that a better mode of recording was available fails to negate the authenticity of the sufficiently corroborated recording.[4]

Credico's challenge to the tape's chain of custody fares no better.  Few would dispute that the cassette's chain of custody leaves much to be desired, but "[w]e have long rejected the proposition that evidence may only be admitted if a 'complete and exclusive' chain of custody is established."  <u>United States v. Rawlins</u>, 606 F.3d 73, 82 (3d Cir. 2010) (quoting <u>United States v. DeLarosa</u>, 450 F.2d 1057, 1068 (3d Cir. 1971)).  To admit evidence, a District Court need only find "a reasonable probability that the evidence has not been altered in any material respect," <u>United States v. Jackson</u>, 649 F.2d 967, 973 (3d Cir. 1981) (quoting <u>United States v. Luna</u>, 585 F.2d 1, 6 (1st Cir. 1978)), and such a finding "is afforded great deference," <u>Rawlins</u>, 606 F.3d at 83.  Although not

---

[4] The underlying basis for Credico's challenge to the tape's admissibility is his contention that one of the eight voicemails recorded onto the cassette was from 2012 rather than 2014.  Credico Br. 26.  We fail to see how this claim casts any doubt on the tape's authenticity.  Credico does not contend that the cassette was altered so as to include a voicemail from 2012 that was not in Milligan's voicemail inbox on the morning of February 6, 2014.  Credico's challenge, then, appears to focus not on the adequacy or accuracy of the <u>recording</u> of the contents of the voicemail inbox, but rather the accuracy of the voicemail inbox itself, in that the inbox allegedly included a message from 2012 in a list of messages received in 2014.  Such a challenge, to the extent believable, goes to the relevance and persuasiveness of the suspect voicemail to the Government's case, not to the authenticity of the recording.  It is therefore properly directed to the jury at trial, rather than to the judge at an evidentiary hearing aimed at determining only whether the recording faithfully reproduces the evidence it purports to embody.

generally dispositive of admissibility, unexplained gaps in the chain are relevant considerations for the jury when assessing the weight of the evidence.  Id.

Here, Milligan testified that immediately after making the recording, he brought the cassette to the Assistant United States Attorney, but that thereafter he did not know the tape's whereabouts.  Special Agent Joshua Hubiak — the case agent on the Credico matter — testified that Special Agent Joseph Carpenter — who was filling in for Hubiak on February 6, 2014 — later gave him a box containing a manila envelope with the tape inside, and that the tape thereafter remained in a box at Hubiak's desk inside the secured FBI offices.  Furthermore, the tape's tabs had been removed to prevent it from being recorded over and the tape's label had the markings that were placed upon it at the time that Milligan made the recording.  Credico does not assert that the tape or label were tampered with, nor does any evidence in the record suggest it.  Credico nonetheless attempts to raise such an inference through his expert's inability to certify that the tape was not tampered with.  Although the Government failed to account for the tape's whereabouts between when Milligan left it with the prosecutors and Hubiak received it from Carpenter, in the face of only an innuendo of tampering, the Government met its burden to show a reasonable probability that the evidence was not altered.  Finally, the District Court properly instructed the jury that they could consider any defects in the chain of custody when determining the tape's authenticity and weight.  Accordingly, the District Court did not abuse its discretion by admitting the recordings into evidence.

7

III.

Credico next challenges the sufficiency of the Government's evidence showing that he acted with the requisite intent under the statute. Our review is "highly deferential, and we will overturn a verdict only 'if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'" United States v. Caraballo-Rodriguez, 726 F.3d 418, 430–31 (3d Cir. 2013) (en banc) (quoting United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987)). Credico asserts that he cannot be guilty under § 115(a)(1) because although he was under the impression that Milligan and the FBI were responsible for his expulsion from West Chester University, they in reality had no involvement in the matter. Credico thus asserts that he could not have intended to interfere with or retaliate against the agents' performance of their official duties, because they never undertook any. This argument fails. Section 115(a)(1) includes a specific intent requirement focusing on the defendants' subjective purpose for making the threats. See, e.g., United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013). Credico admitted that he left these messages because he believed that Milligan, in his capacity as an FBI agent, had been involved in his expulsion. If not for this belief, Credico would not have made the threats; in other words, the threats were "on account of" Milligan's official conduct. The fact that neither Milligan nor anyone at the FBI ever actually took such action does not negate the driving purpose behind Credico's

8

conduct.[5] And given the deferential standard of review, the evidence was sufficient to allow a reasonable factfinder to conclude that Credico acted with the intent to retaliate on account of the agents' official conduct.

IV.

Credico's final two challenges concern the correctness of the District Court's jury instructions. "We generally exercise plenary review in [determining] 'whether the jury instructions stated the proper legal standard,' and review the refusal to give a particular instruction or the wording of instructions for abuse of discretion." Gov't of the V.I. v. Mills, 821 F.3d 448, 465 (3d Cir. 2016) (quoting United States v. Flores, 454 F.3d 149, 156 (3d Cir. 2006)). As discussed below, neither of his claims have merit.

A.

First, Credico claims that the District Court erred in refusing his request to instruct the jury to consider whether the threats were "conditional or whether they specify the exact time and date for carrying out the supposed threat." Appendix 639. Credico claims that his threats were conditional because he prefaced a number of his statements with the request that the agents "sign a release" form that Credico believed would allow him to fight and injure the agents without repercussion. As an initial matter, Credico never prefaced his threats against Milligan's wife or Fitzgerald's daughter with any conditions,

---

[5] Nor could the statute plausibly operate this way. If it did, then an individual who called in a threat to an FBI office he believed was investigating him would not be liable if the paperwork beginning the investigation had not arrived in the office, but an individual who undertook the same conduct but whose paperwork fortuitously had arrived would be liable. Criminal liability cannot turn on such administrative minutiae.

9

and so this argument is inapplicable to his conviction under counts two and four for threatening the agents' immediate family members in violation of § 115(a)(1)(A).

But even on the merits, Credico's argument is unpersuasive. Credico relies on our decision in United States v. Kosma, 951 F.2d 549 (3d Cir. 1991), to assert that a threat that does not specify the time and place wherein it will take place is a conditional, rather than "true," threat. This argument misreads Kosma and such a rule would be at odds with common parlance. In Kosma, we noted that to decide whether a statement constitutes a true threat, courts must view the statement "in context, and regarding the expressly conditional nature of the statement," and determined that the threat at issue was not conditional because, among other things, Kosma "specified the precise date, time and place" for when the threat would be actualized. Id. at 553–54. We determined that those factors were sufficient to render the threat "true" rather than conditional, but did not suggest that they were necessary to finding a true threat. Indeed, we noted just the opposite: "Even if Kosma's threats were truly conditional, they could still be considered true threats." Id. at 554 n.8. Common parlance also militates against this definition of a true threat, because even the paradigmatic true threat that any listener would take seriously – "I will kill you" – would fail for lack of specificity. See, e.g., United States v. Hoffman, 806 F.2d 703, 711 n.5 (7th Cir. 1986) (considering "I will kill you" an "unambiguous or direct" threat). Here, Credico's messages were filled with vivid details suggesting exactly how he would take his vengeance against the agents and their families, and the mere inclusion of one arguably conditional clause among multiple serious threats does not immunize him from liability. See, e.g., Kosma, 951 F.2d at 554 n.8 (citing

10

United States v. Callahan, 702 F.2d 964 (11th Cir. 1983), concluding that the defendant there made a true threat because "[a]lthough the carrying out of the threat might have been conditional upon Secret Service aid and agreement, the threat itself was not," id. at 966). Accordingly, because our caselaw does not support the test for conditional threats advocated by Credico, and because in any event the nature of his threats belie the claim that they were conditional, the District Court did not abuse its discretion in refusing to give the instruction.

B.

Credico's second claim related to the jury instructions is that the District Court improperly rejected his contention that, in light of the Supreme Court's ruling in Elonis v. United States, 135 S. Ct. 2001 (2015), the definition of "true threat" has been changed and thus that the District Court was required to instruct the jury not only that a reasonable person would view the words as a threat, but also that Credico must have subjectively intended to make the threat or known that the communication would be viewed as a threat. In Elonis, the Supreme Court held that a different statute using the word threat — 18 U.S.C. § 875(c) — included an unstated scienter requirement that the defendant subjectively intended to make the threat. Elonis, 135 S. Ct. at 2013. Contrary to Credico's claim, it is clear that despite its view that Elonis did not govern § 115(a)(1), the District Court nonetheless gave a subjective intent instruction. Credico's complaint is therefore moot, and we need not address whether the Elonis Court's ruling concerning § 875(c) affects the mens rea requirement of § 115(a)(1).

11

## V.

For the foregoing reasons, we will affirm the judgment of the District Court.