**UNITED STATES of America**

v.

**Otto E. PASSMAN.**

**Crim. Nos. 78–00159, 78–00211.**

United States District Court,
District of Columbia.

July 10, 1978.

Jeffrey S. White, Sp. Atty., Dept. of Justice, Washington, D. C., for plaintiff.

William W. Taylor, III, James T. Hamilton, David Ginsburg, Washington, D. C., for defendant.

MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

Former Representative Otto E. Passman currently faces two indictments arising out of his alleged participation in the well-publicized Korean influence-buying scandal. The immediate question to be determined is whether Mr. Passman, now 78 years old and suffering from various ailments, is mentally and physically competent to be arraigned and stand trial. The Court has reviewed the evidence and testimony presented at an exhaustive competency hearing, considered the legal memoranda and argument of counsel, and determines that the defendant is competent to participate in the proceedings against him.

I.

The government accuses Mr. Passman, in brief, of having used his office to pressure the Republic of Korea to purchase rice from United States exporters, through the Food for Peace program and commercial sales; and to ensure that Mr. Tong Sun Park of Korea would be agent for such sales and thereby obtain a commission, from which Park paid Passman large sums of cash. The first indictment, filed March 31, 1978,

charges violation of the conspiracy, bribery and illegal gratuity statutes.[1] The second indictment, filed April 28, 1978, charges tax evasion.[2]

The defendant was hospitalized in the psychiatric unit of Touro Infirmary, New Orleans, Louisiana, two days before return of the first indictment. His counsel moved to postpone arraignment, claiming that defendant was incompetent to stand trial, suffered from "significant depression, lapses of memory and an inability to concentrate and think clearly" and was unable to assist effectively in his defense. Representations were also made that the defendant's physical health was too poor to allow him to attend court proceedings without substantial risk.

Mr. Passman's confinement at Touro Infirmary extended from March 29 until May 19, when he left against medical advice. Within several days, however, he was admitted to the St. Francis Hospital in his home town of Monroe, Louisiana, suffering from pneumonia and possible congestive heart failure. He entered St. Francis on May 22 and was discharged on June 1.

On May 3, 1978, an Order was entered appointing two medical experts as witnesses of the Court: Dr. John V. Russo, an internist, and Dr. Leon Yochelson, a psychiatrist. These doctors examined the defendant at the Touro Infirmary in mid-May and again in Washington, D.C., on June 16.

The competency hearing began on June 19, 1978, and included four days of testimony followed by the legal argument of counsel.[3] The Court heard from the two court-appointed expert witnesses, three expert and one lay witness presented by the defense, and one expert and one lay witness presented by the government. Direct and cross-examination of the witnesses was extensive. The Court also had the benefit of reports written by each of the expert witnesses and other physicians, and records covering defendant's most recent hospitalizations at Touro Infirmary and St. Francis. The professional witnesses and counsel for the parties also had full access to medical reports and hospital records.

## II.

The determination of the defendant's competency to be arraigned and stand trial is ultimately a legal decision to be made by the Court in the exercise of its sound discretion. *United States v. Knohl,* 379 F.2d 427, 434 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). The decision is one of utmost importance, involving as it does the defendant's fundamental constitutional rights to due process of law, effective assistance of counsel and a fair trial. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), *citing Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). While the standards of mental and physical competency are easily stated in the abstract, they can be fairly applied only in reference to the particular defendant involved, here former Representative Passman.[4] *Wilson v. United States,* 129 U.S.App.D.C. 107, 391 F.2d 460 (1968). Accordingly, the various opinions ventured by the witnesses and the presentations and arguments of counsel have

1. 18 U.S.C. §§ 371, 201(c)(1), and 201(g), respectively.

2. 26 U.S.C. § 7201.

3. A lengthy and involved competency proceeding is not required in this Circuit. At a minimum, "the inquiry must be of record and both parties must be given the opportunity to examine all witnesses who testify or report on the accused's competence." *Hansford v. United States,* 124 U.S.App.D.C. 387, 390, 365 F.2d 920, 923 n.8 (1966); *United States v. Caldwell,* 178 U.S.App.D.C. 20, 35, 543 F.2d 1333, 1348 (1975).

For an analysis of the federal pretrial competency hearing, *see* W. Pizzi, Competency to Stand Trial in Federal Courts: Conceptual and Constitutional Problems, 45 U.Chi.L.Rev. 21, 52–64 (1977).

4. To assist the Court and the witnesses in evaluating the competency question, counsel submitted statements outlining the scope of the case and estimating 1) the quantity of material that defendant would have to review, 2) the number of witnesses to be called, and 3) the time required to present their cases.

all assisted the Court in the exercise of its discretion.

The classic test of mental competency, as enunciated by the Supreme Court in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), is:

> whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

In *Dusky* and in the controlling statute,[5] the competency standard is stated in the conjunctive: the defendant must be able both to assist in his own defense and understand the proceedings against him.

The requirement that the defendant have a rational and factual understanding of the proceedings against him safeguards the accuracy of the guilt determination process, since "[o]ne who cannot comprehend the proceedings may not appreciate what information is relevant to the proof of his innocence."[6] At a minimum, the defendant should understand the substance of the indictment, the defenses available to him, and the essentials of criminal trial proceedings.[7] The Court does not address this issue in detail because the expert witnesses agree that Mr. Passman does have such an understanding of these proceedings.

The second *Dusky* requirement, that the defendant be able to consult with his lawyer and assist in his defense, does not refer to his own legal judgment but rather to "such phases of a defense as a defendant usually assists in." *Lyles v. United States,* 103 U.S.App.D.C. 22, 27, 254 F.2d 725, 729–30 (1957), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). Judicial decisions, notably those of this Circuit, identify the primary factors deserving consideration here. Perhaps most important is the state of the defendant's memory, since, at all stages of the case, he should be able to relate pertinent facts, names and events to his attorneys. However, the defendant need not remember every fact that trial might encompass; even defendants with amnesia have been found competent to stand trial. *Wilson, supra,* 129 U.S.App. D.C. at 110–111, 391 F.2d at 463–64; *United States v. Hearst,* 412 F.Supp. 858, 861 (N.D. Cal.1975). An important factor is the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources. *United States v. Sermon,* 228 F.Supp. 972, 978 (W.D.Mo.1964).

The defendant should have adequate ability to review and evaluate documents and other written evidence bearing on the case. With the help of counsel, he should have an "appreciation of what the Government's evidence against him is and the corresponding [ability] to consider the wisdom of taking a course other than standing trial on the merits." *United States v. David,* 167 U.S.App. D.C. 117, 120, 511 F.2d 355, 358 (1975). Assuming the case does go to trial, the defendant should be able to decide objectively whether to exercise his constitutional right to take the stand, *Blunt v. United States,* 128 U.S.App.D.C. 375, 377, 389 F.2d 545, 547 (1967); and if he does, he must be able to testify in an intelligent, coherent and relevant manner. He should be sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses, and discuss the testimony with his attorneys. *Hansford v. United States,* 124 U.S.App.D.C. 387, 391, 365 F.2d 920, 924 (1966). He should be able, through his counsel, to postulate questions to the witnesses.

None of the above factors alone control the Court's determination of whether the defendant can rationally assist his counsel. They merit different rankings of importance, depending on the factual and legal

---

5. Title 18 U.S.C. § 4244, Mental incompetency after arrest and before trial.

6. Note, Incompetency to Stand Trial, 81 Harv. L.Rev. 454, 457 (1967).

7. Judicial Conference of the District of Columbia Circuit, Report of the Committee on Problems Connected with Mental Examination of the Accused in Criminal Cases Before Trial 125–32 (1965).

complexity of the particular case, the projected length of the trial and the number of witnesses to be called. Ultimately, as now Chief Judge Skelly Wright of this Circuit appropriately noted,

> the question must come down to whether, "in the light of the personal intellectual or emotional deficiencies of the accused he can perform the functions essential to the fairness and accuracy of the particular proceedings in which he is presently involved."

Wilson, supra, 129 U.S.App.D.C. at 110, 391 F.2d at 463.

In addition to the two-part Dusky test of mental competency, the Court must consider the standard of physical competency. The defendant cannot fairly be subjected to legal proceedings that would involve a substantial risk to his health or life. United States v. Bernstein, 417 F.2d 641, 643–44 (2d Cir. 1969); Knohl, supra at 436–38. The question of physical competency often arises in tandem with mental competency issues where, as in Mr. Passman's case, a defendant allegedly suffers from senility and the infirmities that accompany old age. As Judge Marvin Frankel noted in United States v. Doran, 328 F.Supp. 1261, 1263–64 (S.D.N.Y.1971),[8] the Court need not attempt the "absurd task" of quantifying the risk of legal proceedings to the defendant, but should consider: the medical evidence; the evidence of defendant's activities outside the courtroom; the availability of measures to minimize the risks to defendant's health in subjecting him to trial; the temporary or permanent character of the physical problem; and the "magnitude and seriousness of the case—i. e., the degree of loss or injury to the public interest deemed to result from delay or total preclusion of a trial."

### III.

#### A.

There is no disagreement among the medical experts as to the nature of the defendant's several disabilities. There is disagreement, however, on the degree and extent of his medical problems and their effect on his competency to stand trial.

The defendant has a genuine depressive state, largely related to his real life problems, which reduces somewhat the efficiency of his cognitive functioning. While he does dramatize his emotional reactions somewhat, he is distressed and his emotional state is variable. He has a mild to moderate chronic brain syndrome, either early Alzheimer's disease or cerebral arteriosclerosis. He has a history of mild cardiovascular disease. Within recent years he has had continuing prostate problems requiring surgical procedures. Finally, the defendant has a notable hearing loss and some symptoms of senility.

Testimony that Mr. Passman was incompetent to stand trial came from the defense medical witnesses: Dr. C. W. Ulrich, an internist; Dr. F. W. Black, Ph.D., a neuropsychologist; and, Dr. C. W. Hall, a psychiatrist. Dr. Ulrich of Monroe, Louisiana, first examined the defendant in September, 1977, at the request of the House Committee on Standards of Official Conduct. The Committee was then seeking defendant's appearance as a witness. He opined that, at the time, Passman's health was too poor to allow him to testify in Washington or by deposition in Monroe. Thereafter, however, Passman did appear before the House Committee.

Prior to September Dr. Ulrich had had little if any contact with the defendant, although both were residents of Monroe, Louisiana. Since then and since his report to the House Committee, however, he has become the defendant's treating physician. On January 24, 1978, the defendant called Dr. Ulrich for an appointment, complaining of serious depression and suicidal thoughts. Dr. Ulrich examined him and reported to

8. In Doran, the 57 year-old defendant suffered from severe cardiovascular disease, hypertension, speech and memory difficulties, and emotional instability, among other things. The court found him incompetent to stand trial on a seven year-old indictment for conspiracy to defraud and making false claims for payment.

his counsel that he had deteriorated markedly, reiterating that his testimony would be unreliable. On January 26, defendant was hospitalized at St. Francis for exhaustion and remained there through February 5, 1978. In late May, 1978, responding to a call from Mr. Passman's wife, Dr. Ulrich examined and hospitalized the defendant at St. Francis for illness that followed in the wake of his discharge from Touro Infirmary. Indeed, Dr. Ulrich was present at much, if not all, of the four-day competency proceeding.

Even taking into consideration the length of Dr. Ulrich's contact with the defendant, the Court cannot give full credit to his opinions. In several notable instances his examination notes belied his conclusion that Passman suffered from an increasingly impaired memory loss. For example, he noted that the defendant: on September 26, 1977, recounted minor details of his prostate surgery and renal failure; on January 25, 1978, remembered he had an appointment with Dr. Liles the next day; on May 22, stated he had been examined by six doctors at Touro, one internist and one psychiatrist from Washington; on June 7, referred to recent car accidents and resulting increased cost of car insurance. Each incident recalled by Mr. Passman had in fact occurred. The notes also undermine Dr. Ulrich's conclusion that the defendant's judgment is faltering. On September 26, 1977, Mr. Passman calculated, not unreasonably, that he would have already been indicted if the two-year investigation had uncovered any evidence against him; on January 25, 1978, he refused a prescribed rest cure because travel could be misinterpreted to mean he was evading investigators; on June 7, at an office visit, he knew that his impending appointment with a Houston, Texas, psychiatrist was to be kept confidential. Dr. Ulrich's testimony that defendant was in an especially agitated state during his winter hospitalization is directly refuted by Passman's bedside interview of February 3 with KNOE–TV, discussed *infra*, at page 10. Finally, and what the Court cannot ignore, is that Dr. Ulrich's role as a consultant gradually became that of a treating physician.

Dr. Black, a neuropsychologist, examined the defendant in mid-March 1978. The examination stemmed from the government's desire to secure a pre-indictment report on his health. On the basis of a battery of mental status examinations he offered a diagnosis of organic brain syndrome. Dr. Hall, a psychiatrist who conducted a neuropsychiatric examination of defendant at the request of his counsel approximately one week before the hearing, concurred in this diagnosis. Drs. Ulrich, Black and Hall were in agreement and shared the opinion that the defendant would be unable to participate intelligently in trial proceedings because the disease would so severely, and unpredictably, impair his memory and communication skills.

The conclusions which Drs. Black and Hall drew from Mr. Passman's condition were not shared by the government's expert witness in neurology, Dr. Richard Strub. Dr. Strub, a colleague of Dr. Black, participated in the pre-indictment examination of defendant. While he concurred in the diagnosis of organic brain disease and agitated depression, he testified that Mr. Passman has the ability to participate in a trial that is structured and monitored with an eye to his problems.

Dr. John Russo, the Court-appointed cardiovascular and internal medicine specialist, found generally that Mr. Passman is in acceptable health. He found a history of cardiovascular disease which presents only a limited problem at this time. He also found a neurologic problem of recent origin, which dated variably from six to 18 months. His impression was that the defendant currently suffers from a chronic brain syndrome with Alzheimer's disease as a possible basis.

As to the defendant's ability to consult and confer with his counsel and otherwise to participate in the trial, Dr. Russo's report states that there is reason for caution, and recommends that daily proceedings be limited to no more than two two-hour sessions, separated by at least two hours of rest.

In addition to the medical witnesses there was testimony of two lay persons. Mr.

Marion Edwards, a friend, was presented on the defendant's behalf. He testified as to their personal, intimate and long-existing friendship of nearly 10 years, describing it as a "father-son" relationship. He recounted various examples of Mr. Passman's present behavior and in general painted a picture of the defendant's complete mental and physical breakdown. This witness, by profession, was a realtor and insurance broker and has been involved in the purchase and sale of farms and plantations, including rice-producing lands. Edwards testified that since 1970 he has accompanied Mr. Passman on several official foreign trips, including at least three around-the-world excursions. On several of these trips he served as an "agricultural consultant" at government expense.

In contrast to Edwards, the government's lay witness, Kay Williams LaFrance, presented what the Court accepts as persuasive and more impartial testimony. Serving as a newsperson for KNOE–TV of Monroe, Louisiana, she originated and conducted four filmed interviews with Mr. Passman, one in late 1977 and three in early 1978. The interviews were relatively recent and presented a fair and reasonably candid portrait. In each, the defendant was responsive to questions, demonstrated an understanding of the subjects being discussed, and displayed an appreciation of the problems confronting him in connection with the Korean scandal. For an interview on January 17, 1978, he had obviously prepared a statement that was both straightforward and coherent. On February 3, he gave an interview from his room at St. Francis Hospital, where he was being treated for exhaustion; his composure on videotape belies his claims of severe agitated depression.

On February 8, following his release from St. Francis, Mr. Passman initiated an interview from his office in Monroe. As Ms. LaFrance testified, he said he wanted to set the record straight and tell the people about a recent local newspaper article on an AID Project funded by the Congressional committee which he had formerly chaired. The defendant explained that the press had made reference to him without seeking a statement from him before publication. He related in some detail the responsibility and operations of his former committee and named the Congressman who should be most familiar with the AID Project in question.

More significant than the four television interviews was her testimony concerning a telephone interview of approximately 15 minutes which she had with defendant on May 2, 1978, when he was at Touro Infirmary. The interview came about when he returned her call. The discussion focused on his second indictment for tax evasion, which incensed him because, in his view, it was the same as the first indictment and therefore not timely until he had been tried on the first. She testified that, though his voice was weak, he sounded emotionally stable and "seemed to know what he was talking about . . . and was able to make his point." He requested that he be quoted rather than recorded on the air when the interview was released and suggested that she contact his attorney, Mr. Gravel, to verify the facts. He had the presence of mind to call her back about 20 to 30 minutes later to ask that she include in her story that the interview had been by telephone from the Touro Infirmary, New Orleans, to Monroe, and that two physicians had been appointed to examine him in the Infirmary.

Of all the psychiatrists and neurologists who testified, Dr. Leon Yochelson, the Court-appointed psychiatrist, had the most contact with Mr. Passman. His last examination was on June 16, 1978, two days before the hearing. Dr. Yochelson's reputation and experience as a psychiatrist, with forensic expertise, are well-documented. In light of these factors, his testimony and opinions merit summarizing.

His diagnosis was that the defendant has a chronic brain syndrome of mild degree, probably based on early senile changes; and neurotic depression of a reactive type, mild to moderate. Even within the framework of his diagnosis and impressions, he is of the

opinion that defendant would be able to participate in an extended trial, conducted under flexible and monitored conditions.

He found and recognized that even though Mr. Passman has a mild memory difficulty, this should not present significant problems for the defendant in recollecting situations of particular importance in his life, for example, facts related to his official actions during the time period covered by the indictments; matters personally important to the defendant and in which he was immediately involved are likely to be remembered. The defendant's memory of recent events was evidenced by his recollection of two psychiatric examinations conducted in Houston, Texas, and Baltimore, Maryland, within the past two weeks, as well as an appointment with Dr. Ulrich in early June. Indeed, Dr. Yochelson testified that defendant's memory, as well as his depression, showed improvement between his first interview in May and the one held within two days of the hearing.

Dr. Yochelson found that, while Mr. Passman is a literal-minded individual, he has the capacity to understand and participate in a discussion. Therefore, he can consult rationally with counsel both before and during the course of trial. Should he take the stand, he has sufficient memory and communication skills to testify in his behalf. Dr. Yochelson expressed his opinion that the defendant's thinking is relevant, that he shows sufficient judgment, demonstrates a capacity to abstract in situations of a personal nature, and otherwise manifests comprehension.

The defendant has a hearing problem described by Dr. Yochelson as mild, but by other witnesses, as ranging from a 30 to 40 percent impairment. However, since this is a recognized problem, necessary adjustments and accommodations can be made during the course of a trial.

In the doctor's judgment, Passman understands and recognizes the difference between the two indictments. He understands the role played by the judge, jury and counsel, both government and defense, during the course of a trial; the role played by witnesses during the course of the trial and the matter of their direct and cross-examination. The defendant has the ability and capacity to consult and confer with counsel, both in advance of and during the course of trial, in a rational and intelligent manner. Dr. Yochelson further ventured that should the defendant testify in his own behalf, he would have sufficient memory and otherwise have the ability and the capacity to communicate.

In contrast to Drs. Black and Hall, Dr. Yochelson's opinions were based on his clinical psychiatric examinations. While he did not question the validity of neuropsychological examinations or psychological testing, he pointed out that the subject is tested under artificial conditions and circumstances unreal to life. A clinical psychiatric examination, however, tends to stress and rely more on an individual's problems and capacities in actual life circumstances. Dr. Yochelson further observed that abnormal findings in psychological testing are likely to be more pronounced than can be validated by observing an individual's functioning.

This Court recognizes fully the credibility and the general acceptability given to mental status examinations. However, the medical witnesses in this proceeding do not disagree on the presence of an organic brain syndrome condition caused by Alzheimer's disease, or, in one doctor's opinion, arteriosclerosis. The more important aspect, however, is the degree of that impairment and whether the defendant is rendered incompetent to stand trial.

### B.

The question of Mr. Passman's health and physical competency is as important as the mental competency inquiry. All agree that, at 78 years of age, he suffers from certain infirmities, none of which promise to improve. However, the expert witnesses also agree that the risk and strain inherent in standing trial would not alone substantially jeopardize his life, assuming, as the Court will ensure, that courtroom sessions are flexible and medical care is available. Therefore, under the test of *United States*

*v. Doran, supra,* Mr. Passman is physically competent to proceed in these cases.

A related question, which has justifiably preoccupied counsel, witnesses and the Court, is whether legal proceedings would substantially increase the risk of the defendant taking extreme means. The medical witnesses do not discount this possibility, both in light of statements attributed to the defendant and the statistical evidence that suicide occurs significantly more often in people of his age and condition than in the general population. Dr. Hall ranked the suicidal risk as high, due not only to fear of legal proceedings but also to loss of bodily function and confusion. Dr. Yochelson, with general consensus, testified convincingly that there is a greater probability that defendant would survive than commit suicide, basing this opinion among other things on the fact that Mr. Passman had read and discussed the indictments at the time of his second examination, though he had originally claimed that reviewing those documents would be disastrous. He further testified that the defendant has a personality quality which would keep him from giving up and does not exhibit the guilt feelings that appear almost invariably in people who are major suicidal risks. Indeed, considering Mr. Passman's frequent statements that he would seriously consider suicide only if found guilty, it is not unthinkable that the opportunity to prove his innocence at trial would have a positive effect on his depression.

Without presupposing to quantify anything as subtle as suicide potential, the Court finds from the testimony and evidence that the impact of legal proceedings on the defendant would not be so great as to cause a substantial risk of self-destruction.

One final observation is appropriate. Throughout the four days of testimony and the final period of argument, the Court has observed the defendant. He has been passive and unemotional. But, nonetheless, he has been attentive. He has not been demonstratively alert but he has at times appeared to be both responsive and sensitive to selected testimony of both the medical and lay witnesses, showing an awareness of who they were and what they said. The Court has not observed him confer with counsel regularly or with any degree of frequency. Considering the nature of a large portion of the medical testimony, this of course is understandable. On the day of his arraignment, which followed the competency hearing, he appeared relaxed, walked without assistance, responded to the limited questioning in a clear, crisp manner and otherwise appeared quite alert.

## IV.

In circumstances such as this, the defendant must have the ability to defend himself. Perfect mental and physical health is not required. Good mental and physical health is not required. A defendant is competent to stand trial in a criminal proceeding if he is able to understand the charges and the nature of the proceedings; to assist and cooperate with his counsel; to follow the evidence; to make a proper defense; and to participate in his defense.

Having evaluated the testimony of the witnesses and having reviewed the entire record and the applicable legal principles, the Court, in the exercise of its discretion, determines that Otto E. Passman is presently competent to stand trial.

The duty to ensure a fair trial for Mr. Passman is continual and the Court recognizes that it must be alert to circumstances suggesting a change in his condition. This responsibility is shared by both defendant's counsel and government counsel who have closer contact with him. At this point, however, on the basis of all evidence and testimony, the motion of defense counsel to postpone further proceedings must be denied. This matter shall proceed immediately to and through the pretrial stages.