UNITED STATES of America ex rel.
Sylvester COLEMAN, Petitioner,

v.

Sidney HICKS et al., Respondents.

Civ. No. 79–3495.

United States District Court,
D. New Jersey.

Sept. 23, 1980.

Seymour Margulies, Jersey City, N. J., for petitioner.

Bruce Myron Merrill, Deputy Atty. Gen., State of New Jersey, Div. of Criminal Justice, Princeton, N. J., for respondents.

## OPINION

LACEY, District Judge.

Petitioner in this habeas corpus action, 28 U.S.C. § 2254, was indicted by an Essex County Grand Jury for unlawful possession of marijuana, unlawful possession of a dangerous knife, atrocious assault and battery, and murder. N.J.S.A. 24:21–20; N.J.S.A. 2A:151–41; N.J.S.A. 2A:90–2; N.J.S.A. 2A:113–1 and 2. Petitioner pled not guilty to all charges; the State chose to go to trial on the murder indictment. Petitioner was tried to a jury, which convicted him. Subsequent to the trial, petitioner pled guilty to possession of marijuana and possession of a dangerous knife. As part of the plea bargain the atrocious assault and battery charge was dismissed. The trial judge imposed a 20–to–25–year sentence for murder in the second degree. The petitioner received sentences of 2 to 3 years on both possession charges, with all sentences being made concurrent with each other.

After the Appellate Division of the Superior Court affirmed petitioner's conviction, the Supreme Court of New Jersey denied certification. He then filed his petition here.

Acting pro se, petitioner filed a petition containing four constitutional claims: (1) denial of due process because the trial judge incorrectly found he was competent to stand trial; (2) denial of due process because the State did not bear the burden of establishing competency to be tried or sanity at the time of the murder; (3) denial of the right to a fair and impartial jury trial; and (4) denial of due process because the trial court did not hold a competency hearing to determine if petitioner was competent to plead guilty or be sentenced.

1. By letter dated July 10, 1980, I advised counsel that I would decide the case based on the amended petition.

Before considering the merits of these claims, it is first necessary to determine that petitioner "has exhausted the remedies available in the court of the State." 28 U.S.C. § 2254(b). Petitioner's counsel later filed an amended complaint which deleted petitioner's fourth claim.[1] The other three claims were retained. All claims having been exhausted, I now turn to the merits.

Petitioner contends that he did not receive a fair and impartial jury trial. One of petitioner's defenses at trial was that he was not guilty by reason of insanity. On July 3, 1975, the jury began deliberating. That same day the Newark Star Ledger reported a Morris County court had released a defendant six weeks after a jury had found him not guilty by reason of insanity. Petitioner's counsel became aware of the article while the jury was deliberating, Transcript of July 25, 1975, at 7, but he took no action until after the jury had returned a guilty verdict and had been discharged. Only then did he move to have the jury reassembled and interrogated to see if any juror had read the article and had been influenced by it. *Id.* at 3–4. Petitioner's counsel candidly admitted that he had no factual basis for believing that any juror had seen the article. *Id.* at 4–5.

The court denied petitioner's application, stating that "[t]he absence of facts in the affidavit would indicate to me that they do not exist." *Id.* at 5. Noting that "the Court's [sic] treatment of the defenses of insanity had received widespread attention," *id.* at 11, the judge reminded counsel that he had charged the jury "not to read anything or watch anything of a similar type of case" and that he had stressed to the jury that "they have to decide it on the law and the facts and not concern themselves with the ultimate results." *Id.* at 12. He therefore concluded, "I can't believe that this jury ignored all the instructions that I had given them during the course of this trial and I think it would be unappro-

priate [sic] and it would be against the mandate . . . set forth in . . . those cases in interpreting [Rule 1:16–1] to permit an interview of the jurors in this regard or for this purpose." *Id.* at 13.

■ The petitioner's claim is without merit. He did not move in a timely fashion. When he finally moved he had no evidence any juror had seen the article, let alone read it in disregard of the trial judge's admonitions. Moreover, even if jurors had read the article, it is far from clear that petitioner would have been substantially prejudiced. Accordingly, this claim must be dismissed. *See United States v. Taylor*, 569 F.2d 448, 454 (7th Cir.), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978); *United States v. Armocida*, 515 F.2d 29, 48–49 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Vento*, 533 F.2d 838, 869–70 (3d Cir. 1976); *Frame v. United States*, 444 F.2d 71 (9th Cir.), *cert. denied*, 404 U.S. 942, 92 S.Ct. 291, 30 L.Ed.2d 256 (1971); *United States v. Manning*, 440 F.2d 1105, 1112 (5th Cir.), *cert. denied*, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971).

Next, petitioner contends that he is unlawfully incarcerated because the jury was unconstitutionally charged that he bore the burden of proving insanity by a preponderance of the evidence. According to petitioner, the State should have been assigned the burden of proving his sanity.

In *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), the Supreme Court upheld an Oregon statute which required the defendant to prove insanity beyond a reasonable doubt. Since *Leland*, however, the Supreme Court has stated on a number of occasions that due process compels the prosecution to prove all elements of a crime beyond a reasonable doubt. *See, e. g., Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Relying on these cases, petitioner

argues that *Leland* is no longer good law, because it impermissibly allocates the burden of persuasion to the criminal defendant.

Petitioner's contention is without merit, for *Leland* has not been overruled. The Supreme Court dismissed, as not raising a substantial federal question, a case presenting a direct challenge to the validity of *Leland*. *Rivera v. Delaware*, 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976). More recently, the Supreme Court announced, "We are unwilling to reconsider *Leland* and *Rivera*." *Patterson v. New York, supra*, 432 U.S. at 207, 97 S.Ct. at 2325. *Rivera* and *Patterson* plainly foreclose the argument petitioner advances. As the Court of Appeals for the Third Circuit succinctly stated in affirming a statute placing the burden of proving voluntary intoxication on the defendant, "[T]he [Supreme] Court has held that the defense may be required to establish insanity." *United States ex rel. Goddard v. Vaughn*, 614 F.2d 929, 935 (3d Cir. 1980) (citations omitted).

■ The State of New Jersey has chosen to require the defendant seeking an acquittal by reason of insanity to establish, by a preponderance of the evidence, his insanity. *State v. Lewis*, 67 N.J. 47, 48, 335 A.2d 12 (1975); *State v. DiPaglia*, 64 N.J. 288, 293, 315 A.2d 385 (1974). *See also State v. Molnar*, 81 N.J. 475, 492, 410 A.2d 37 (1980). The Due Process Clause does not forbid the states from requiring the defendant to carry the burden of disproving sanity. *Rivera v. Delaware, supra; Leland v. Oregon, supra; United States ex rel. Goddard v. Vaughn, supra; Nelson v. Hutto*, 597 F.2d 137, 138 (8th Cir. 1979) (per curiam); *Duisen v. Wyrick*, 566 F.2d 616, 617 (8th Cir. 1977) (per curiam); *Grace v. Hopper*, 566 F.2d 507, 509–10 (5th Cir.), *cert. denied*, 439 U.S. 844, 99 S.Ct. 139, 58 L.Ed.2d 144 (1978). Accordingly, petitioner was not deprived of any constitutional right when he was obliged to persuade the jury by a preponderance of the evidence that he was insane at the time the murder was committed.

Petitioner's final claim concerns the trial court's decision finding him competent to

stand trial. Before trial commenced, petitioner's attorney moved to have his client declared incompetent. The trial judge ordered a hearing, at which two witnesses appeared.

The first witness was Dr. Seymour Kuvin, a psychiatrist, who testified as an expert witness. Dr. Kuvin had examined petitioner for an hour approximately three weeks before the hearing. He based his testimony almost entirely on facts learned during that interview.

Dr. Kuvin diagnosed petitioner as suffering from organic brain damage. Tr. at 7, 47. He testified that petitioner's condition resulted from ingesting LSD. According to Dr. Kuvin, petitioner's condition manifested itself in a variety of ways.

> [H]e gave the appearance of being spaced out, he was very flat in his affect, he would stare, he didn't seem to be communicative and I would have to repeat questions, I would ask a question and I would get a stare for a reply as if it didn't penetrate and then I would have to repeat questions again.

Tr. at 9. Petitioner did not, according to Kuvin, fully understand the significance of the charges against him. On the competency assessment sheet, which was admitted into evidence at the hearing as a defense exhibit, he rated petitioner as severely incapacitated with respect to the ability to appreciate the nature and range of possible penalties. He reached that conclusion because it "didn't seem to make a dent" on petitioner when he was informed that he might be imprisoned for life. Tr. at 11. It was Dr. Kuvin's opinion that petitioner did not fully understand the meaning of a murder charge. Tr. at 29. Dr. Kuvin also believed that petitioner was not quite sure why he was incarcerated at the time of the hearing—while petitioner gave a partially correct response initially to the question of why he was at the Bordentown Correction Center, he subsequently expressed uncertainty. Tr. at 19–20. *See also* Tr. 40–41. Dr. Kuvin also said that petitioner's non—

verbal conduct revealed confusion as to the reason for his being jailed. Tr. at 20.

Dr. Kuvin's testimony also bore on petitioner's capacity to assist his lawyer at trial. Petitioner, said Dr. Kuvin, knew who his lawyer was and probably trusted him. Tr. at 48. Dr. Kuvin did not believe, however, that petitioner could understand his lawyer's advice or make a decision after accepting advice, even though he was capable of taking advice. Tr. at 50. Nor could he spot contradictions in testimony or erroneous testimony at trial. *Id.* While Dr. Kuvin believed petitioner would remember having been in court the preceding day, he doubted petitioner could "carry from one hour from the next or one day from the next what has been going on as far as court is concerned." Tr. at 46. Moreover, Dr. Kuvin described petitioner as suffering from a severe incapacity to challenge prosecution witnesses realistically. Tr. at 13.

Probably the most significant aspect of Dr. Kuvin's testimony concerned his analysis of petitioner's ability to remember the events surrounding the death of his girlfriend. On direct examination Dr. Kuvin was asked if the petitioner could disclose to his attorney information about the crime.

> Well I felt that this was total, he was unable to give any information concerning the offense in my conversation with . . . his attorney[;] I learned that Mr. Coleman was unable to give his attorney any facts and as a matter of fact, I was able—
>
> .    .    .    .    .
>
> And I found that I was able to glean actually more factual data than his attorney was able to obtain on my conversations and yet my conversations with him were really very poor as far as factual information about the time of the alleged offense and I'm speaking of the homicide charge.

Tr. 11–13.[2] However, while Dr. Kuvin was certain petitioner could not remember what

---

2. Dr. Kuvin, in his report, wrote, "Mr. Coleman was unable to recount any of the material surrounding the alleged incident involving the murder of Chardie McKennon." Petitioner never moved the report into evidence, but he did include it in the appendix filed in the Appellate Division.

he did the day of the murder, Dr. Kuvin was unsure of the mechanism causing this memory loss. At one point he stated that the lack of memory was due to petitioner's use of LSD, Tr. at 45; earlier, he said it was a "reasonable possibility" that petitioner had repressed any memory of the crime. Tr. 18, 23.

Dr. Kuvin declined to say whether he believed petitioner to be competent. Viewing this as a difficult case, he chose to leave the decision to the court without recommending either a finding of competency or incompetency. Tr. at 31. Dr. Kuvin did testify that petitioner's condition would not improve over time and that therapy would not ameliorate it but only prevent further decline. Tr. at 46.

After Dr. Kuvin concluded his testimony, the petitioner took the stand. In response to a question by his attorney, he described with considerable vividness what happens during an LSD flashback. Tr. at 52. Cross–examination then began. Although he was not certain, petitioner had "a feeling" that the new questioner was the prosecutor. Tr. at 53. He stated that he did not initially recognize Dr. Kuvin, but that he could now identify him as the man he had spoken with recently. Tr. 53–54. He could recall that he and Dr. Kuvin had discussed drugs, and not basketball, Tr. at 54–55, but he did not know why Dr. Kuvin had visited him. Tr. at 56. Nor did he know why his lawyer had been visiting him. Tr. at 58. While petitioner understood the meaning of the words used by the prosecutor, he did not know why the prosecutor was asking him questions. Tr. at 64. Responding to questions from the trial judge, petitioner did say that he knew he could be imprisoned for the crimes with which he was charged; he also showed some understanding of the events giving rise to those charges. Tr. at 66–70.

Once petitioner completed testifying, Dr. Kuvin briefly returned to the stand.

Q. During the period of time that you were in the courtroom you've had an opportunity to observe Mr. Coleman and had an opportunity to observe the length of time with [sic] which it took him to associate a question and then formulate an answer, can you give me some opinion concerning that time length of being able to formulate an answer after hearing a question.

A. This is indicative of his brain damage, in plain language the connections aren't working as rapidly as they should, it's not a question of contemplation it's the question of the thought being able to reach certain areas of the brain and response being formulated and the comments that I had about this is that I felt the only condition to me, testimony that I gave prior is that I don't feel he would be able to follow testimony because of this length of time of the thought process.

Tr. at 70–71. The final piece of evidence in the record is the stipulation by the State that petitioner sometimes took "a considerable length of time" to answer questions; his attorney once timed him as looking at the questioner for 30 seconds before answering the question. Tr. at 72.

Issued the day after the competency hearing, the trial judge's letter opinion found petitioner to be competent. The court expressed uncertainty over petitioner's ability to recall facts concerning his activities at the time of the murder, but found the defendant "capable of comprehending his position and consulting intelligently with [defense counsel] in his defense. . . . It is the court's opinion the defendant does understand the charges against him; does understand his position; is capable of intelligently answering [defense counsel's] question, and can appreciate that if he is convicted of the crime he stands a possibility of lengthy jail sentences." He found that the petitioner understood he was about to go on trial, could answer questions intelligently, was oriented as to time and place, and could remember from hour to hour what had transpired in

court. While agreeing that petitioner sometimes hesitated when answering questions, the judge concluded that petitioner was aware of his surroundings and could, even if after a pause, formulate a coherent reply. The court was satisfied petitioner knew the relationship of the trial participants to him. Petitioner looked at the prosecutor with "apparent animosity"; he remembered having seen Dr. Kuvin; he could recall having seen his defense lawyer before and regarded him as a friend; and he knew who the judge was. The judge also recited some of petitioner's replies to questions about the events covered by the indictments. These responses were usually appropriate.

Finally, the court observed that Dr. Kuvin had testified that petitioner's condition would not improve. This was significant to the court because "[t]his defendant must be tried sometime."

Based on this record petitioner contended that he had been deprived of his due process rights when the trial judge found him competent. After carefully reviewing the competency hearing transcript and the evidence introduced at that hearing, I decided that petitioner, in the interest of justice, should be afforded an additional opportunity to adduce evidence of his competency at time of trial. The trial court's opinion, while dealing comprehensively with certain aspects of petitioner's claim, did not seem to address all issues raised by the testimony at the hearing.[3] Because the significant interests at stake warranted a full exploration of the petitioner's competency when he was placed on trial, I granted petitioner the chance to produce supplemental information.

On July 8, 1980, a hearing was held on the issue of petitioner's competency to stand trial. The only witness to testify at the hearing was petitioner's trial attorney, William Graves, Esq.

Mr. Graves testified that he doubted petitioner fully understood the nature of the charges against him. Petitioner's trial attorney had the "impression" his client had not been "clear" on the legal consequences of conviction. The witness, however, admitted that this "impression" was not based on any specific responses of the petitioner. For example, while Mr. Graves believed petitioner had not comprehended the difference between first degree murder and manslaughter, this belief was not based on anything petitioner said or did.

Confirming the trial judge's finding on this point, Mr. Graves testified that petitioner knew that his attorney was there to help him, and that the prosecutor was there for the opposite reason.

Dr. Kuvin asserted that petitioner would be unable to remember trial testimony or assist his attorney at trial. Mr. Graves, however, conceded that he was unable to substantiate Dr. Kuvin's fears. Not once did Mr. Graves consult with his client concerning evidence produced at trial. Mr. Graves requests that during a trial his clients communicate with him by written notes, rather than whispered conversations. Petitioner, although he knew how to write, did not jot down any messages for his attorney during the trial. This absence of communication, however, can be explained in many ways—it provides no affirmative evidence that petitioner was merely a confused and uncomprehending spectator at his own trial.[4]

Mr. Graves' admission that he did not discuss trial strategy or testimony with petitioner during the trial bears on the issue of competency in another respect. At the close of the competency hearing the prosecutor stipulated that petitioner frequently

---

**3.** For example, Dr. Kuvin testified that he believed petitioner would be unable to challenge prosecution witnesses or spot contradictions in testimony. He also doubted whether petitioner could consult with his attorney in a meaningful way. The trial judge did not explicitly evaluate this testimony in determining petitioner to be competent.

**4.** Mr. Graves was of the opinion that petitioner was not a "real presence" at his own trial. This belief, though, was not based on specific words or deeds, and therefore can be given little weight.

hesitated before answering questions. I was concerned that this characteristic might have interfered with petitioner's ability to consult with his attorney, and his attorney's ability to elicit information from his client while the trial proceeded. However, petitioner never attempted to communicate with his lawyer; more important, his lawyer never asked for information or advice. Mr. Graves does not remember inquiring of his client, " 'What about this?' " with respect to any testimony. Petitioner's slowness in responding cannot be said, therefore, to have interfered discernibly with his defense. Since no questions were put to petitioner while he sat at counsel's table, the problem of delayed reply simply never arose.

At the July 8, 1980, hearing Mr. Graves testified about one other matter: petitioner's amnesia. Corroborating Dr. Kuvin, the witness stated that petitioner had no recollection of the events on the day of the murder. According to Mr. Graves, he was hindered in presenting an alibi defense because petitioner could not recall what he was doing when the murder occurred.[5]

Petitioner did furnish some information to counsel. He was able to give his attorney the names and addresses of his father and sister. When the prosecution gave petitioner access to a yellow pill as part of the pretrial discovery, petitioner identified the pill as "yellow sunshine," the type of LSD the victim put in his food. Petitioner may also have been able to provide his lawyer with the name of a person who could describe petitioner's relationship with the decedent. Finally, petitioner, although he had

no specific memory of his activities on the day of the murder, could recall many facts concerning his drug use history and some of the bizarre incidents that occurred while he was living with the victim. These facts—which comprised the bulk of his trial testimony—furnished support for his insanity and involuntary intoxication defenses, and provided a basis for a verdict of other than first degree murder. This summarizes Mr. Graves' testimony.[6]

The question before the court is whether the record shows petitioner was deprived of his constitutional right to due process when the state trial court found him competent.[7]

Petitioner attacks the trial judge's decision on two separate grounds. First, he vigorously contends that the judge improperly required petitioner to prove his competency.

The Court of Appeals for the Third Circuit has declared that when competency is at issue, "there is no room for a rule of law placing any burden of proof on the defendant." *United States v. DiGilio*, 538 F.2d 972, 988 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). *See United States v. Hollis*, 569 F.2d 199, 205 (3d Cir. 1977). Thus, error would have taken place if the trial court had made petitioner prove the fact of his incompetence. But petitioner's assertions notwithstanding, no improper allocation of the burden of proof was made. The trial judge affirmatively found that petitioner

does understand the charges against him; does understand his position; is capable of intelligently answering [his attorney's]

---

5. Petitioner also remembered that his father came looking for him after the murder and that he then left for Pennsylvania.

6. Mr. Graves testified that at one point during the trial his client leaned over and asked if the trial was an "hallucination." While Mr. Graves believes he brought this remark to the judge's attention, the discussion with the judge occurred off the record. Indeed, as the witness conceded, there is nothing in the record indicating that he and his client had any problems communicating.

7. No claim has been made, or could be made, that the state court hearing was procedurally

defective. Petitioner had ample opportunity to present testimony on the competency issue, and the trial judge ruled after listening to that testimony. Only the outcome, not the method, is being challenged. Neither side has addressed the question of who bears the burden of proof here. *United States v. Hollis*, 569 F.2d 199 (3d Cir. 1977), strongly suggests that in a habeas proceeding based on competency the burden should rest on the petitioner. Because I find by a preponderance of the evidence that petitioner was competent, the answer to the question is of academic interest only.

questions; can follow the progress of the trial and can appreciate that if he is convicted of the crimes he stands a possibility of lengthy jail sentences.

The judge further found that petitioner "is able to comprehend his position, to consult intelligently with counsel and plan his defense." The trial judge did not say petitioner was found competent because he had failed to produce convincing evidence of incompetency; rather, he declared petitioner competent because he believed petitioner possessed sufficient mental abilities to permit the trial to proceed fairly. The Third Circuit said in *DiGilio* that "[a]llocation of the burden of proof will be significant, in theory at least, only in the rare case when, assuming the evidence is weighed by the preponderance of evidence standard, the conflicting evidence is in equipoise in the mind of the fact finder." 538 F.2d at 988. For the state trial judge, the issue of petitioner's competence did not balance evenly. From the testimony and his own observations, he was satisfied that petitioner was, in fact, competent.[8]

Petitioner's second argument is that he was wrongly found competent. Both parties agree that the test for competency is whether a defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him.' " *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). *See Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975); *United States v.*

*DiGilio, supra*, 538 F.2d at 988. The parties disagree as to the result when that test is applied to the facts of this case.

Although the issue is not altogether free from doubt, I conclude that the evidence in the record shows that the petitioner was competent at the time he stood trial in 1975. After observing petitioner's demeanor and hearing him testify, the trial judge determined that petitioner could follow the trial, could answer his lawyer's questions, and certainly could understand the nature of the proceedings. This decision is supported by the record at the state competency hearing.[9] The petitioner displayed an understanding of the roles of the participants at the trial; he also showed that he could associate actual events with allegations contained in the indictments. Additionally, petitioner, while sometimes evasive and unsure, generally gave appropriate responses to questions put to him by the defense lawyer, prosecutor, and judge.

In his brief petitioner charges that the trial judge violated *Dusky* by finding petitioner competent simply because he was oriented to time and place and had some recollection of events. Brief in Support of Petition for Writ of Habeas Corpus at 17. This accusation lacks merit. Complying with the *Dusky* guidelines, the opinion dealt with petitioner's ability to comprehend his position, to consult with his attorney, to follow the progress of the trial, and to answer questions intelligently. The court also noted that petitioner "was aware of his surroundings, looked at the person who was questioning him at the particular time, and addressed his answer to that person." The

---

**8.** Petitioner has insisted that he was given the task of demonstrating his incompetence to the trial judge. The source of this belief is unclear. Nowhere in his opinion did the trial judge analyze the question of burden of proof. At the hearing held before me Mr. Graves testified that the participants at the competency hearing operated under the presumption that criminal defendants were competent. He admitted, however, that this "ground rule" was embodied neither in an official rule nor in a court decision. I decline to follow petitioner's suggestion that I hold that he was deprived of his due process rights because of an unwritten understanding which is not reflected in the record made at the time of the competency hearing

and which is not alluded to in the court's opinion.

**9.** Although I am not relying on the statutory presumption that these factual findings are correct, it should be noted that such a presumption does exist in competency cases. 28 U.S.C. § 2254(d). *See Pierce v. State of Oklahoma*, 436 F.Supp. 1026, 1032 (W.D.Okl.1977); *United States ex rel. Bornholdt v. Ternullo*, 402 F.Supp. 374, 377 (S.D.N.Y.1975); *United States ex rel. Parson v. Anderson*, 354 F.Supp. 1060, 1070 (D.Del.1972), *aff'd*, 481 F.2d 94, 95 (3d Cir.) (per curiam), *cert. denied*, 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 479 (1973).

court properly applied *Dusky* in evaluating petitioner's competency.

Petitioner also complains that the trial court "completely disregarded the import of the psychiatric expert who spent an hour examining the patient." Brief in Support of Petition for Writ of Habeas Corpus at 19. This, too, is incorrect. The trial judge's opinion on the competency questions contains a brief analysis of Dr. Kuvin's report. Moreover, it is highly significant that Dr. Kuvin declined to give an opinion on the ultimate question of competency. Dr. Kuvin left that decision to the judge, saying he was glad to be relieved of the responsibility. Tr. at 31. In his report Dr. Kuvin said, "It is difficult for this examiner to make a definitive statement about [petitioner's] capacity to stand trial." Since petitioner's own expert refrained from declaring petitioner incompetent, petitioner cannot complain that the judge failed to follow an expert witness' conclusion. Nor can petitioner say with accuracy that the judge neglected to consider the expert's factual findings.

Mr. Graves' testimony did nothing to undermine the trial judge's findings. In some respects—for example, petitioner's ability to answer questions—it corroborated the state court's conclusions. While Mr. Graves doubted that petitioner fully understood the ramifications of being on trial, he admitted that he had not derived this impression from any particular words or deeds of the petitioner.

The testimony also allayed some of my concerns about issues the trial judge may not have reached. *See* note 3, *supra.* Dr. Kuvin feared that petitioner would not be able to challenge prosecution witnesses, remember testimony from hour to hour, or consult with his attorney in a meaningful way. Mr. Graves presented no evidence validating these anticipated difficulties; no evidence was adduced that any of these problems had cropped up during the trial. These projected impediments cannot be said to have affected in any way petitioner's ability to defend himself.

It may be that petitioner did not remember trial testimony from hour to hour and that he had difficulty in following the course of the trial. But any claim that petitioner was handicapped by these disabilities must fall. Adequate proof of the existence of these disabilities is lacking, and, in any case, there is no evidence they prejudiced petitioner's right to a fair trial. Petitioner's silence when sitting at counsel table affords no basis for inferring that mental dysfunctions rendered petitioner incompetent. The record simply does not support the claim that the incapacities cited by Dr. Kuvin interfered in any way with petitioner's defense.

■ The record in this case clearly demonstrates that petitioner at the time of his trial possessed below–average mental capacities in a variety of respects. The record also demonstrates, though, that petitioner could rationally talk with his lawyer, could answer his lawyer's questions, understood to some degree the implications of criminal charges, and had a basic understanding of the structure of a trial. While there is some evidence that petitioner did not have a full appreciation of the charges against him, neither Mr. Graves' nor Dr. Kuvin's impressionistic testimony on this score was particularly convincing, and I agree with the state trial judge that petitioner revealed an adequate comprehension of his situation.[10] Accordingly, I find that petitioner met the test for competency set forth in *Dusky.*[11]

10. In affirming, the Appellate Division noted that when petitioner later pleaded guilty to the other offenses "no question was raised of [his] ability to comprehend his position on the nature of the offenses involved.

11. Although Dr. Kuvin testified that petitioner had no recollection of the events on the day of the murder, petitioner has never distinctly raised the claim that he was incompetent to stand trial because of his amnesia. The brief filed in the Appellate Division noted that Dr. Kuvin testified petitioner could not disclose to his attorney information relating to facts surrounding the offense, but petitioner did not raise in that brief a due process claim based squarely on his loss of memory. Neither petition for a writ of habeas corpus even mentions his memory deficiency. Finally, the brief filed on behalf of petitioner in this court by his

attorney does not raise amnesia as creating a due process claim. Under these circumstances, I must find that petitioner has not presented to me a due process claim resting on the state's prosecution of an amnesiac defendant.

However, even if the issue were properly before me, the outcome would be the same. The well–settled rule is that amnesia does not constitute a *per se* ground for finding incompetency to stand trial. *United States v. Mota*, 598 F.2d 995, 998 (5th Cir. 1979); *United States ex rel. Parson v. Anderson*, 481 F.2d 94 (3d Cir.), *cert. denied*, 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 479 (1973); *United States v. Borum*, 464 F.2d 896, 900 (10th Cir. 1972); *United States v. Stevens*, 461 F.2d 317, 320 (7th Cir. 1972); *United States v. Sullivan*, 406 F.2d 180, 186 (2d Cir. 1969); *Wilson v. United States*, 391 F.2d 460, 463–64 (D.C.Cir.1968); *United States v. Passman*, 455 F.Supp. 794, 796 (D.D.C.1978); *United States v. Hearst*, 412 F.Supp. 858, 861 (N.D.Cal.1975); *State v. Pacheco*, 106 N.J.Super. 173, 177–79, 254 A.2d 540 (App. Div.), *aff'd* 54 N.J. 579, 258 A.2d 368 (1969), *cert. denied*, 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 65 (1970); *R. v. Podola*, 3 All E.R. 418 [1959] 3 W.L.R. *See* Note, Amnesia: A Case Study in the Limits of Particular Justice, 71 Yale L.J. 109 (1961).

It may be true that in some situations a loss of memory means that a criminal defendant cannot be constitutionally tried. *See Parson v. Anderson, supra* (*dictum*); *Wilson v. United States, supra*. No exceptional facts, however, take this case out of the general rule.

Petitioner's loss of memory is permanent, so a continuance would have served no purpose.

*See United States v. Swanson*, 572 F.2d 523, 526–27 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978). Despite the memory impairment, petitioner could fully describe to the jury details of his unusual relationship with the decedent, his history of drug abuse, and the phenomenon of flashbacks. Indeed, petitioner's loss of memory was consistent with some of the defense theories urged upon the jury.

Losing his memory may have hampered petitioner in raising an alibi defense. That is pure speculation, though, because nothing suggests that such a defense was available. Petitioner was seen by an eyewitness murdering the victim; the eyewitness already knew petitioner. A witness testified that she had heard shouts emanating from the apartment petitioner shared with the decedent. After hearing that the police were looking for him, petitioner fled. Given the petitioner's mental condition and some of the features of the relationship between petitioner and victim, a violent denouement was hardly surprising. Finally, petitioner has not pointed to any information unearthed in the past seven years showing he was elsewhere at the time of the murder or suggesting an alternative killer. No prejudice has been shown to have accrued to petitioner because of his memory lapse. *United States v. Sullivan, supra*; *United States v. Borum, supra*.

Petitioner's amnesiac condition is unfortunate. But neither itself nor in combination with other components of petitioner's mental make–up did this condition result in an unconstitutional trial.